The **ONEIDA INDIAN NATION OF NEW YORK STATE, et al., Plaintiffs,**

**United States of America, Plaintiff–Intervenor,**

v.

The **COUNTY OF ONEIDA, NEW YORK, and the County of Madison, New York, Defendants.**

No. 74CV187.

United States District Court, N.D. New York.

Sept. 25, 2000.

*feld,* 420 U.S. 636, 638 n. 2, 95 S.Ct. 1225, 43 L.Ed.2d 514 (1975)).

Thomas D. Barr, Cravath Swaine &
Moore, New York City, William W. Taylor,

III, Zuckerman Spaeder Goldstein, Taylor & Kolker, Washington, D.C., of counsel, for The Oneida Indian Nation of New York.

Arlinda F. Locklear, Jefferson, MD, of counsel, for Oneida Indian Nation of Wisconsin.

Frances Skenandore, Skenandore & Associates, Oneida, WI, of counsel, for The Oneida Indian Nation of Wisconsin.

Robert S. Smith, Carey R. Ramos, Paul Weiss Rifkind Wharton & Garrison, New York City, of counsel, for The Oneida of the Thames Council.

G. Robert Witmer, Jr., David Schraver, Nixon Peabody LLP, Rochester, NY, of counsel, for Counties of Madison and Oneida.

Charles E. O'Connell, V. Heather Sibbison, U.S. Department of Justice—Environment & Natural Resources Division, Washington, D.C., of counsel, for United States of America.

James H. McGowan, Menter Rudin & Trivelpiece, Syracuse, NY, of counsel, amicus curiae.

Charles G. Curtis, Jr., Foley and Lardner, Madison, WI, of counsel, amicus.

## MEMORANDUM–DECISION AND ORDER

McCURN, Senior District Judge.

By its very nature Indian land claim litigation engenders inflamed passions on all sides; perhaps no more so than when the specter is raised, as it is by the present motions to amend, of mass ejectment or eviction of literally thousands of individuals who have been residing on this land for years, and in some instances for generations. Before delving into that highly volatile issue, as well as several other less volatile issues, it is necessary to review at least some aspects of this quarter of a century old territorial dispute.

### Background

Between 1778 and 1868, "the United States ... ratified hundreds of treaties with Indian tribes or nations." *Cheung v. United States,* 213 F.3d 82, 89 (2d Cir.2000) (citation omitted). In the present case, however, the court is concerned with a number of "treaties" which allegedly the United States did *not* ratify during that same time frame. This lawsuit is one of several wherein the Oneida Indian Nation of New York State ("the Nation"), the Oneida Indian Tribe of Indians of Wisconsin ("the Wisconsin"), and the Oneida of the Thames ("the Thames")[1] have sought to establish their rights to approximately six million acres of land located in central New York.

In 1970, the Oneidas commenced a "test case" challenging the validity of a 1795 agreement wherein their ancestors conveyed 100,000 acres to the State of New York ("the State") in violation of the Trade and Intercourse Act of 1793, 1 Stat. 329 ("the NIA"). Reversing the Second Circuit, in 1974 the Supreme Court unanimously held that for purposes of asserting federal question jurisdiction, the Oneidas had stated a possessory claim based upon federal common law. *See Oneida Indian Nation v. County of Oneida,* 414 U.S. 661, 675, 94 S.Ct. 772, 781, 39 L.Ed.2d 73 (1974) (*"Oneida I"*). On remand the district court found that the only named defendants, Oneida and Madison Counties ("the Counties"), who for two years in the late 1960s occupied the nearly 900 acres at issue, were liable to the Oneidas for $16,694.00.[2] That sum represented the fair

---

1. Except where necessary to distinguish between them, the court will collectively refer to the three Oneida entities as "the Oneidas" or "the Tribal plaintiffs." Herein, generic references to "plaintiffs" shall be read as referring to the Tribal plaintiffs and the plaintiff-intervenor, the United States of America ("the U.S.").

2. In the test case the Oneidas sought to recover *only* monetary damages. As part of a deliberate litigation strategy in that case, they did not sue individual landowners; nor did they seek ejectment as a remedy. *See* George C. Shattuck, The

Oneida Land Claims A Legal History 13, 67, & 79 (1991). "By limiting the claim, the parties hoped to settle the issues in a calmer political atmosphere." INDIAN TRIBES A CONTINUING QUEST FOR SURVIVAL (A REPORT OF THE UNITED STATES COMMISSION ON CIVIL RIGHTS) 110 (June 1981) (footnote omitted). This was a wise strategy because, as will be seen, even the mere possibility of adding the private landowners as defendants heightens community tensions almost to the boiling point, creating mounting levels of distrust and a loss of perspective by all concerned.

rental value, as unimproved, of the land which was part of the Oneidas' 1795 cession of land to the State.

And although it would take another 11 years, eventually, in 1985, the Supreme Court further held in the test case that the Oneidas could maintain a federal common law based action for violation of their possessory rights in their ancestral homeland. *See County of Oneida v. Oneida Indian Nation,* 470 U.S. 226, 236, 105 S.Ct. 1245, 1252, 84 L.Ed.2d 169 (1985) (*"Oneida II "*). Likewise, the *Oneida II* Court held that the Oneidas' claims were not barred by any of the following defenses: preemption, statute of limitations, laches, abatement, ratification or the doctrine of nonjusticiability. *See id.* at 240–250, 105 S.Ct. at 1254–1260. In affirming the viability of the Oneidas' claims to their ancestral land, the Supreme Court gave the Oneidas a federal forum for their claims, but it left unanswered many important questions.

Especially significant in terms of the present motions is the Supreme Court's lack of guidance as to the scope of the relief to which the Oneidas eventually may be entitled. In an oft-quoted footnote, the Court explained that it did not address the issue of whether, for example, "equitable considerations should limit the relief available to the present day Oneida Indians[,]" because petitioners did not raise that issue in *Oneida II;* nor did the Second Circuit address it. *See id.* at 272 n. 27, 105 S.Ct. at 1271 n. 27. What is more, the Court pointedly "express[ed] no opinion as to whether other considerations may be relevant to the final disposition of this case should Congress not exercise its authority to resolve these far-reaching Indian claims." *See id.* These unanswered questions pertaining to remedies are at the heart of the motions currently before the court.

Meanwhile, on May 3, 1974, the Nation and the Wisconsin commenced the present action, again naming only the Counties as defendants. But this time, instead of only one

treaty, at issue are roughly 30 separate "agreements," *see* Affidavit of William W. Taylor, III (Dec. 7, 1998) ("Taylor Aff."), exh. A thereto at 14–15, ¶ 38, and exhs. 3–32, wherein the State purportedly acquired or transferred from the Oneidas approximately 250,000 acres of land.[3] For most of the past 25 years this case lay dormant while the Oneidas doggedly pursued the test case.

Upon reassignment to this court from Northern District of New York Senior Judge Howard G. Munson, the stay which had been in effect for many years was lifted. When the Counties then refused to consent to the Oneidas and the U.S. amending their respective complaints, plaintiffs filed these motions to amend pursuant to Federal Rules of Civil Procedure 15(a), 20(a) and 21. After those filings but before oral argument, consistent with the parties' renewed interest in settlement negotiations, on February 24, 1999, the court signed an Order of Reference, appointing Ronald J. Riccio as Settlement Master. Shortly thereafter the parties began negotiating in earnest.

Given the long history of unproductive settlement efforts in all of these *Oneida* land claim actions, at that time the court decided that not to allow any further stays for settlement purposes. Settlement efforts and litigation would proceed on parallel tracks. Therefore, while settlement discussions were ongoing, on March 29, 1999, the court heard oral argument as to plaintiffs' motions to amend. Since then, despite yeoman-like efforts by Mr. Riccio, on June 9, 2000, settlement negotiations abruptly ended, forcing the court to declare an impasse. *See Oneida Indian Nation v. County of Oneida,* No. 74–CV–187 (N.D.N.Y. June 22, 2000). So, regrettably, this case is back on an active litigation track only, with no immediate prospect of renewed settlement efforts.

Although there is a marked similarity between the Oneidas' *proposed* amended complaint and the U.S.' *proposed* amended com-

---

**3.** There is a discrepancy between the original and the amended complaint in terms of the acreage at issue. *Compare* Complaint at 4, ¶ 8 (describing the subject lands as a "Reservation," consisting of "a tract of land of about 300,000 acres"), *with* Taylor Aff., exh. A thereto at 3, ¶ 6

(amended complaint describing amount of acreage as "approximately 250,000"). Prior to submitting their revised amended complaints, both the Oneidas and the U.S. should carefully review same to ensure that no such discrepancies or inaccuracies appear therein.

plaint ("the amended complaints"),[4] there are differences between the two. Therefore, to decide the present motions to amend, it is necessary to separately examine each of those two complaints. Furthermore, while it is obvious that the most controversial proposed amendment is the requested addition of approximately 20,000 private landowners as defendants, there are other amendments which the court must also address and it will do so before turning to the polarizing issue of potential private landowner liability.

### I. Oneidas' Amended Complaint[5]

A comparison of the Oneidas' original with their amended complaint demonstrates that there are two primary areas of difference between them. The first relates to the parties and the second to the relief sought. Only the Nation and the Tribe are named as plaintiffs in the original complaint, whereas the amended complaint also includes the Thames as a plaintiff. Then, in terms of the defendants, the Oneidas are seeking to add approximately 20,000 or more "persons or entities ... that occupy or have or claim an interest in any of the subject lands ... and their successors and assigns." Taylor Aff., exh. A thereto at 7, ¶ 19. They are further seeking to name the following as defendants: (1) the State of New York ("the State"); (2) the New York State Thruway Authority; (3) Niagara Mohawk Power Corporation; and (4) Oneida Valley National Bank.[6] These entities, as well as the defendant Counties, are being sued both individually and as representatives of the potential class of landholders described above.

By far the most troublesome difference between the original and the amended complaints, however, is the nature and scope of the relief which the Oneidas are seeking, especially in terms of the private landowners. Originally the relief which they sought was fairly circumscribed, and by most standards

comparatively modest. Through these motions, however, the Oneidas are seeking to greatly broaden the scope of relief which they are seeking. Initially they sought the relatively insignificant sum of "at least" $10,000.00, *see* Taylor Aff., exh. F. thereto at 7; whereas now they are seeking an unspecified amount of monetary damages based upon several factors.

On the face of it, the monetary damages which the Oneidas are now seeking are quite broad, especially when considered in light of the potential liability of any single, individual private landowner. More specifically, they are claiming entitlement "to *damages* from *each member* of the Landholder Class ..., *with interest,* in the amount of (a) the fair market rental value of the relevant portions of the subject lands, as improved, for the period of their occupancy *by that member* of the Landholder Class, (b) the amount by which the value of any relevant portion of the subject lands was diminished by any damage, pollution or destruction that occurred during the period of their occupancy *by that member* of the Landholder Class, (c) the value of all minerals and other resources taken from the subject lands *by that member* of the Landholder Class (and those purporting to act with that member's permission) during the period of that member's occupancy of the subject lands, equal to the price of such minerals and other resources in their final marketable state and (d) any diminution in value of the subject lands as a result of any injury to the subject lands arising from the taking of such resources." Taylor Aff., exh. A thereto at 25–26, ¶ 68 (emphasis added). Considering the extensive nature of these damages which they are claiming, and based upon the court's experience in similar litigation, in all likelihood, any amount which the Oneidas eventually may recover will far exceed the $10,000 specified in their original complaint.

---

4. As will be discussed more fully herein, due to the U.S.' change of position on the issue of ejectment, following oral argument it submitted a second proposed complaint in intervention, which supersedes its prior one.

5. Originally, as will be seen, the Thames was not a named plaintiff in this action. Therefore, this

particular reference to the Oneidas includes only the Nation and the Wisconsin.

6. These last three entities will be collectively referred to throughout as "the non-State entities."

Not only is the amount of damages which the Oneidas are seeking greater than the amount which they first sought 25 years ago, but they are expanding the length of the time for which they are seeking such damages. When they commenced this action, the Oneidas had pending before the Indian Claims Commission ("the ICC") claims against the U.S. "The theory of the ICC proceedings was that, by virtue of the NIA, the [U.S.] owed a fiduciary duty to the Oneida[s] ... to protect them against unfair dealings by third parties when disposing of their lands." Taylor Aff., exh. J thereto at 2642. The Oneidas alleged that the U.S. breached that duty because purportedly the Oneidas received "grossly inadequate and unconscionable consideration for the sale of their lands to the State." *See id.* In that ICC proceeding, the Oneidas sought damages from the U.S. for the period prior to 1951. Consequently, when the Oneidas commenced this action in 1974, they limited their claims for monetary relief to 1951 onward. Since then, however, the Oneidas have dismissed the ICC claims. Therefore in their amended complaint the Oneidas are now seeking pre–1951 damages, as well as damages incurred after that date. So now the Oneidas are seeking recovery of damages spanning over 200 years.

The Oneidas' amended complaint also differs significantly from its original insofar as declaratory relief is concerned. The original complaint does not seek declaratory relief at all. In contrast, the Oneidas' amended complaint seeks several explicit declarations, which will be discussed herein. Suffice it to say for now, that although the words "ejectment" or "eviction" do not appear anywhere in the Oneidas' amended complaint, plainly that is the end result which they hope to obtain through a declaratory judgment.

## II. *United States' Amended Complaint*

Eventually, almost 24 years after the commencement of this action, the U.S. moved to intervene on behalf of the Oneidas. Based upon the court's experience in land claim litigation such as this, unfortunately this in-explicable delay on the part of the U.S. is typical and emblematic of its head-in-the-sand attitude which has dominated its handling of Indian land claims through the years, and indeed through the centuries. In any event, by order dated June 2, 1998, Judge Munson granted the U.S.' motion for permissive intervention pursuant to Fed. R.Civ.P. 24(b), but denied its motion for intervention as of right pursuant to Fed. R.Civ.P. 24(a). Thereafter, on September 3, 1998, one day after the case was reassigned to this court, the U.S. filed its complaint in intervention; and six months later, like the Oneidas, it filed a motion to amend its complaint.

In direct contravention of Local Rule 7.1(a)(4), formerly Local Rule 15.1,[7] the U.S. did not "set forth specifically the proposed amendments and identify the amendments in the proposed pleadings." L.R. 7.1(a)(4). Except to state that it is seeking to add as defendants the State and a landholder class the U.S. does not explain how its amended complaint differs, if at all, from the original. This omission is especially glaring because according to the U.S. its "proposed amended complaint contains a *number* of textual modifications[,]" yet, the U.S. did not bother to identify those modifications. *See* United States' Memorandum of Law in Support of Motion for Leave to File Amended Complaint ("U.S. Memo.") at 3 (emphasis added). Furthermore, despite the U.S.' declaration that it "has rewritten its Complaint to clarify and facilitate adjudication[,]" it has failed to identify those clarifications, and they are not readily apparent.

In any event, a comparison of the U.S.' amended complaint with the Oneidas' reveals that although there are similarities between the two, they are not identical. One similarity is that like the Oneidas, the U.S. is seeking to add the Thames as a plaintiff. Another similarity is that both the U.S. and the Tribal plaintiffs seek to add as defendants the State, along with a class comprised of current occupants of the subject lands, or those claiming an interest in the same. *See*

---

7. After the filing of these motions, effective January 1, 1999, Local Rule 15.1, pertaining to the "form of a motion to amend and its supporting documentation," was amended and can now be found in substantially the same form in Local Rule 7.1(a)(4).

U.S. Amend. Co. at 2, ¶ 2; *see also* Taylor Aff., exh. A thereto at 2–3, ¶ 3 and 7, ¶ 19. But unlike the Oneidas, the U.S. is not seeking to add the three non-State entities as defendants.

In terms of relief sought, there is one particularly noteworthy contrast between the amended complaint of the U.S. and that of the Oneidas. The Oneidas do not specifically mention ejectment in their amended complaint. Initially the U.S. did, noting in passing that among other forms of relief it is "possibly" seeking "ejectment." U.S. Amended Co. at 20, Wherefore clause at ¶ (5); *see also* U.S. Memo. at 3 (same). In a frantic attempt to back paddle, and when prompted by questioning from the court, the U.S. "decided . . . to strike all references to ejectment from [its] amended complaint[ ] . . . as it applies to the private landowners." Transcript (Mar. 29, 1999) ("Tr.") at 21. The U.S. made this concession despite agreeing with the Oneidas that "[e]jectment *is* a proper remedy" in this "case of possession." *Id.* at 20 (emphasis added).

The reason for this about-face is that the U.S. believes that its original proposed amended complaint was "misinterpreted." *Id.* During oral argument, in a transparent but ineffective attempt to alleviate the fears of the private landowners, the U.S. emphatically declared that it has "*never, ever* intended that tens of thousands of private landowners and business owners would be forcefully removed from their property." *Id.* at 20 (emphasis added). Therefore, as part of its "fervent desire to end this suit in a negotiated settlement that is agreeable to all parties[,]" following oral argument, the U.S. submitted a revised proposed amended complaint, which the court deems to have superseded the U.S.' original amended complaint. *Id.* at 21 At the same time, the U.S. confirmed in writing that it had decided "to strike all references to ejectment from the prayer for relief *as applied to individual landholders.*" Letter from Charles E. O'Connell, Jr., Attorney, U.S. Department of Justice, Indian Resources Section Environment and Natural Resources Division, to Court (Apr. 7, 1999) (emphasis added). The U.S. was careful though to "retain[ ] the

right to seek . . . ejectment of the State and Counties from appropriate lands within the claim area." *Id.; see also* U.S. Amended Co. at 22, Wherefore Clause at ¶ (5).

Given the predictable maelstrom of controversy which surrounded the filing of these motions to amend, especially as they seek to add countless private landowners as defendants, this abrupt change of heart by the U.S. is not surprising. Indeed, at the risk of sounding jaundiced, this change of course by the U.S. appears to be nothing more than an unsuccessful attempt to placate a fearful public.

### *Discussion*

### I. *Addition of the Thames and the State*

■ Needless to say, the prospect of allowing amendment to add the Thames as a plaintiff and the State as a defendant is far less controversial than the prospect of allowing plaintiffs to amend their complaint to add some 20,000 private landowners. Indeed, not surprisingly, the Counties are eager to have the State as a co-defendant, and do not object to this aspect of plaintiffs' motion. *See* Defendants' Memorandum of Law in Opposition to Plaintiffs' and Intervenor's Motions for Leave to File Amended Complaints ("Co. Memo.") at 6, n. 6; and Tr. at 25 and 77. The State takes no formal position with respect to these motions to amend. Evidently it viewed its inclusion as a defendant in this lawsuit as a foregone conclusion because although not yet formally a party hereto, it actively participated at every step of the way in the aggressive mediation efforts led by Mr. Riccio. Regardless, the court grants the plaintiffs' motion to amend as to the State because, among other reasons, they "derive their title from the State . . ., [its] presence . . . as a defendant should facilitate rather than hinder the resolution of th[is] dispute[.]" *See* Co. Memo. at 6 n. 6.

■ Furthermore, although the Counties do not specifically acquiesce in allowing amendment to include *claims* against the State based upon the federal common law, the NIA, and the Canandaigua Treaty, because they do not object to the addition of the State as a defendant, presumably they also do not object to the addition of *claims*

against the State. Otherwise, the Counties' acquiescence to naming the State as a defendant would be meaningless. Therefore, the court hereby grants plaintiffs' motion to the extent they are seeking to add the State as a defendant herein and to assert claims against it.

■ On the other hand, the Counties do not readily agree to the addition of the Thames as a plaintiff. The Counties do not separately address their reasons for opposing inclusion of the Thames, but instead rely upon their general reasons in opposition to amendment, i.e. delay, expense, and prejudice. During oral argument, for the first time, the Counties asserted that supposedly the Thames is not a tribe recognized by the U.S. government, but rather it is a Canadian recognized Tribe, and hence not a proper plaintiff to this action. That is an argument best left for another day, however, when the issue is properly before the court with full briefing. Given the history of the Thames' involvement in this action and the related test case, the court has little difficulty also allowing this particular amendment.

To be sure, only the Nation and the Wisconsin originally were named as plaintiffs here and in the test case. During the trial of the test case, however, an oral application was made to have the Thames added as a plaintiff therein. Declaration of Carey R. Ramos (March 18, 1999) at ¶ 3, and exh. A thereto. The court granted that relief "in the interest of justice, and in the interest of economy of judicial time and effort[.]" *See id.*, exh. A thereto at 158 and 162. As the Thames concedes, there is no indication in the trial record that that application was being made with respect to the present case as well. *Id.* at ¶ 3. Clearly that was the intent, however, given subsequent events outlined below.

As the Thames is quick to point out, for nearly 25 years, until the filing of the present motions, it certainly appears that all parties considered the Thames to have been a plaintiff herein. For example, in 1979, when the Counties filed a motion for summary judgment in this case and in the test case, the Thames and the Wisconsin *jointly* filed a brief in opposition thereto. *Id.*, exh. B there-

to. Then, in 1983, attorney Locklear, who at that time was representing both the Thames and the Wisconsin, filed a motion to withdraw as counsel for the Thames, and sought substitution of another attorney to represent it. Reply Memorandum of Plaintiff Oneida of the Thames at 3. As the Thames astutely notes, in opposing that substitution motion the Counties filed a letter wherein they specifically refer to the Thames as a plaintiff, and further state that "[t]he ... Thames ... *intervened as a plaintiff in this litigation* [the reservation case][.]" *Id.* (internal quotation marks and citation omitted). In fact, right at the beginning of that letter the Counties' attorney in this action referred to this withdrawal motion "filed by the current attorneys ... for the *plaintiff* Oneida of the Thames[.]" *Id.*, exh. C thereto at 1 (emphasis added). Finally, in 1990, the Thames and the Wisconsin again jointly filed a memorandum of law in opposition to a motion to consolidate by the Nation. *Id.*, exh. D thereto. At no time during any of those proceedings, did any party challenge the Thames' status as a plaintiff to this action. As the foregoing shows, it certainly appears that until fairly recently the Counties considered the Thames to be a named plaintiff in this action, but now they are now objecting to adding the Thames as a plaintiff.

Quite simply, it is too late in the day for this challenge to the Thames' status as a plaintiff. Obviously the parties hereto, as well as the court, have been treating the Thames as a plaintiff for nearly a quarter of a century. The court declines to hold, as the Counties urge, that the Thames should not be deemed to be a plaintiff hereto based upon what was at most a procedural oversight which went unnoticed until the filing of the present motions. Consequently, to the extent the plaintiffs are seeking to add the Thames as a plaintiff to this action, the court grants such relief.

## II. Addition of Private Landowners

### A. Summary of Arguments

In a pithy opinion, the Supreme Court in *Foman v. Davis*, 371 U.S. 178, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962), identified several factors

which have become the benchmark for courts faced with Rule 15(a) motions to amend. In deciding such motions the *Foman* Court instructed district courts to consider the following: "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc[.]" *Id.* at 182, 83 S.Ct. at 230.[8] Mechanically applying these factors, initially the plaintiffs argued that amendment should be allowed because they did not delay; there is no prejudice; and amendment would not be futile.[9]

In an equally rote analysis, and also relying upon the *Foman* factors, the Counties conversely argued that amendment should not be allowed because it would result in "substantial[ ] prejudice" to them in terms of cost and delay. *See* Co. Memo. at 6. Furthermore, according to the Counties, it would be futile to allow amendment of plaintiffs' complaints, at least with respect to the 20,000 private landholders because supposedly that proposed class does not satisfy the requirements for class certification under Fed. R.Civ.P. 23. Finally, the Counties claim that these motions were brought in bad faith.

Shortly before the return date of the present motions, Oneida Ltd., who is not named as a putative defendant, despite the fact that it purports to be the "largest private landowner in the disputed area, ... the largest private employer in the area, and has been an integral part of the Oneida–Madison County community for fully 150 years[,]" filed a motion to intervene. *See* Memorandum of Law in Support of Oneida Ltd.'s Renewed Motion for Leave to File its February 26, 1999 Memorandum of Law in Partial Opposition to the Plaintiffs' Motions to Amend their Complaints' as that of an *Amicus Curiae* ("Oneida Ltd. Memo.") at 2 (citations omitted). Alternatively, Oneida Ltd. requested that it be granted *amicus curiae* status; and there being no opposition to that request, the court granted same. *See* Tr. at 5.

In opposing plaintiffs' motions to amend, Oneida Ltd. is taking a different tack than the Counties. Focusing strictly upon the propriety of adding 20,000 private landholders, it asserts that there is no need to add that group as defendants because, broadly stated, plaintiffs can "obtain a just adjudication and the complete relief they say they seek" even in the absence of those individual defendants. *See* Oneida Ltd. Memo. at 2. Furthermore, Oneida Ltd. is taking the position that if the court agrees that "pursuant to the standards of federal Indian law and fed-

8. Interestingly, although courts and litigants alike routinely invoke these factors with respect to motions to amend, because leave was *not* denied in that case, those factors are obiter dictum and not the Supreme Court's holding. *See Americold Corporation v. United States*, 28 Fed. Cl. 747, 751 (1993). Nonetheless, because over the years courts, including the Second Circuit, have routinely invoked these *"Foman"* factors in analyzing motions to amend, so too will this court.

9. The court is compelled to briefly comment on both the Tribal plaintiffs' and the U.S.' initial supporting memoranda of law. First of all, a comparison of the two reveals that they are virtually identical, with only an occasional change in wording. In the future, when parties are taking substantially similar positions, it would behoove them to submit a joint memorandum, indicating, where necessary, any issues of disagreement. In this way the court is not required to waste scarce judicial resources by reading duplicative memoranda.

What is even more bothersome to the court, however, is the fact that both the Tribal plaintiffs' and the U.S.' supporting memoranda were almost completely bereft of any analysis. They contained only an extremely brief recitation of the standards governing motions to amend— standards with which this court is fully familiar. In short, these two memoranda were practically useless and indicative of the cavalier attitude of these parties, and the Nation in particular, which has pervaded this litigation and settlement efforts since reassignment of this case in September 1998.

The court did gain some insight from the plaintiffs during oral argument and in subsequent memoranda which they filed with the court, but the fact remains that at a crucial point in these motions—*prior* to oral argument—the moving parties provided almost no assistance to the court, or for that matter, to the defendants and to other interested individuals. This is inexcusable, especially where, as here, so much is at stake— not just monetarily, but in terms of the potential impact the resolution of these motions could have on a sizeable portion of the Central New York community.

eral equity practice …, the plaintiffs do not have the right to eject, dispossess, or recover damages from the private landowners[,]" then plaintiffs should not be allowed to amend their complaints to add the 20,000 landowners. *See id.* at 8. Additionally, Oneida Ltd. maintains that amendment should not be allowed because "[t]he potential prejudice to the innocent landowners" here "is 'staggering.'" *Id.* at 17 (quoting *Oneida Indian Nation of New York v. State of New York,* 691 F.2d at 1070, 1082 (2d Cir.1982) ("*Oneida Nation I*")). Oneida Ltd. also asserts that amendment "would result in a large, cumbersome defendant class action that would be difficult to manage and inevitably extend an already ancient case." *Id.* at 20. Lastly, Oneida Ltd. reasons that the Oneidas' motions to amend should be denied because they have unduly delayed in filing same some 25 years after the commencement of this action.

Characterizing the issue as "one of management," Tr. at 18, the Oneidas succinctly respond that they should be allowed to amend their complaint because it would be the "most expeditious and fair way" to resolve this case. Plaintiffs' Memorandum of Law in Support of their Motion for Leave to File an Amended Complaint ("Oneida Memo.") at 13. Otherwise, the Oneidas posit, if amendment is disallowed, these claims will have to be resolved "in more than one lawsuit." Tr. at 8; and 10–11.

### B. Governing Legal Standards

Given that plaintiffs are seeking to add new defendants as well as new claims, their motions to amend implicate not only Rule 15(a), which governs amendment of pleadings generally, but also Rule 20(a), governing permissive joinder, and Rule 21, allowing joinder "of a person, who through inadvertence, mistake or for some other reason, had not been made a party and whose presence as a party is later found necessary or desirable." *United States v. Hansel,* 999 F.Supp. 694, 697 (N.D.N.Y.1998) (quotation marks and citation omitted); *Savine–Rivas v. Farina,* CV–90–4335, 1992 WL 193668, at *1 (E.D.N.Y. Aug.4, 1992) (because the new complaint sought "to add not just new claims or updat-

ed facts[,] but also new parties[,]" along with Rule 15(a), Rules 20(a) and 21 were also involved). However, because "in practical terms [there is] little difference between" these three rules in that "[t]hey all leave the decision whether to permit or deny amendment to the district court's discretion[,]" *id.,* at *2, the court will not separately analyze the present motions under each of those three Rules.

No purpose would be served by that exercise because regardless of which Rule forms the basis for the court's analysis of the present motions to amend, the analysis is substantially the same. *See Clarke v. Fonix Corp.,* 98 CIV. 6116, 1999 WL 105031, at *6 (S.D.N.Y. March 1, 1999) ("Although Rule 21, and not Rule 15(a) normally governs the addition of new parties to an action, the same standard of liberality applies under either Rule.") (internal quotation marks and citation omitted), *aff'd without published opinion,* 199 F.3d 1321 (2d Cir. Oct.14, 1999); *Sheldon v. PHH Corp.,* 96 Civ. 1666, 1997 WL 91280, at *3 (S.D.N.Y. March 4, 1997) (citation omitted) ("[w]hile plaintiffs' motion [to add a new defendant] properly [was] considered under Rule 21 rather than Rule 15, nothing material turns on this distinction[,]" because "[u]nder either rule, leave of the Court is required[,]" and "[to] the extent the limited case law under Rule 21 permits a conclusion, the standard under that rule is the same as under Rule 15[ ]"), *aff'd on other grounds,* 135 F.3d 848 (2d Cir.1998); *H.L. Hayden Co. of New York, Inc. v. Siemens Medical Systems, Inc.,* 112 F.R.D. 417, 419 (S.D.N.Y. 1986) (analyzing together under Rules 15, 20 and 21 proposed joinder of a defendant). Therefore, as did the court in *Expoconsul Intern., Inc. v. A/E Systems, Inc.,* 145 F.R.D. 336, 337 (S.D.N.Y.1993), "[b]ecause Fed. R.Civ.P. 15(a) better suits the arguments put forth by the parties," this court will consider plaintiffs' motions to amend under that Rule alone. *Cf. State of New York v. Panex Industries, Inc.,* 94–CV–0440E, 1997 WL 128369, at *2 (W.D.N.Y. March 14, 1997) (footnote and citations omitted) (emphasis added) ("Inasmuch as responsive pleadings have been served and filed in this action the permissive standards and principles developed under Fed.R.Civ.P. 15(a) are to be used

*regardless* of which rule is sought to be utilized.").

The principles governing amendment under Rule 15(a) are well established, easily stated, and for the most part not seriously disputed here. "Once a responsive pleading has been served, 'a party may amend the party's pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires.'" *Jones v. New York State Div. of Military,* 166 F.3d 45, 50 (2d Cir.1999) (quoting Fed.R.Civ.P. 15(a)) (other citation omitted). Because leave to amend "shall be freely given," generally "amendments are favored 'to facilitate a proper decision on the merits.'" *Black Radio Network, Inc. v. NYNEX Corp.,* 44 F.Supp.2d 565, 573 (S.D.N.Y.1999) (quoting *Conley v. Gibson,* 355 U.S. 41, 48, 78 S.Ct. 99, 103, 2 L.Ed.2d 80 (1957)) (other citations omitted). In fact, as plaintiffs note, in *Duffy v. Anitec Image Corporation,* 89–CV–1115, 1991 WL 44834 (N.D.N.Y. April 1, 1991), this court unequivocally stated that "[t]he obvious intent" of Rule 15(a) "is to evince a bias in favor of granting leave to amend." *Id.* at *1; *see also Rachman Bag Co. v. Liberty Mut. Ins. Co.,* 46 F.3d 230, 234 (2d Cir.1995) (quoting *Foman,* 371 U.S. at 182, 83 S.Ct. at 230) ("The Supreme Court has emphasized that amendment should normally be permitted, and has stated that refusal to grant leave without justification is 'inconsistent with the spirit of the Federal Rules.'"). Indeed, "[t]he Supreme Court has made clear that [Rule 15(a)'s] 'mandate is to be heeded[.]'" *Duffy,* 1991 WL 44834, at *1 (quoting *Foman,* 371 U.S. at 182, 83 S.Ct. at 230).

■ Given this liberal standard, "it is rare for an appellate court to disturb a district court's discretionary decision to allow amendment[,]" *Rachman Bag,* 46 F.3d at 235, in that such decisions are subject to an abuse of discretion standard of review. *See Lane Capital Management, Inc. v. Lane Capital Management, Inc.,* 192 F.3d 337, 342 (2d Cir.1999) (citation omitted). By the same token, however, as this court is acutely aware, "outright refusal to grant the leave without any justifying reason appearing for the denial is not an exercise of discretion."

*Foman,* 371 U.S. at 182, 83 S.Ct. at 230; *see also Anitec,* 1991 WL 44834, at *2 (quoting *U.S. v. Continental Illinois Nat. Bank and Trust,* 889 F.2d 1248, 1254 (2d Cir.1989)) ("[A]s *Foman* makes equally and explicitly clear, that discretion must be exercised in terms of a justifying reason or reasons consonant with the liberalizing 'spirit of the Federal Rules.'"). In other words, despite the considerable latitude which Rule 15(a) grants in terms of allowing amendments, "leave to amend [should] not [be] granted automatically or reflexively." *See Desantis v. Roz–Ber, Inc.,* 51 F.Supp.2d 244, 246 (E.D.N.Y.1999).

Here the court will separately address each of the *Foman* factors, recognizing that ultimately no single factor is determinative. Rather, resolution of these factually unique motions requires the court to engage in a careful balancing process under *Foman* and its progeny.

### 1. Undue Delay

■ The first *Foman* factor, "undue delay," focuses upon whether the movant delayed in seeking leave to amend. Plaintiffs maintain that there is no undue delay here because they have not previously sought to amend their complaints. Moreover, this motion comes almost directly on the heels of the court lifting the stay, which had been in effect since January 1987. Plaintiffs also point to the fact that this action has been dormant for many years.

The Counties are not seriously challenging the timing of these motions to amend. In fact, during oral argument the Counties confirmed that they are not raising undue delay as a basis for denying these motions, because "we all know why this [case] has taken this long." *See* Tr. at 77. The Counties did not elaborate, but presumably they were referring to the fact that during most of the time between the May, 1974 filing of the complaint and the September, 1998 reassignment to this court, the present action was stayed due to sporadic settlement efforts in this case and other related Oneida land claim litigation, including the test case.

Unlike the Counties, who all but conceded the timeliness of these motions to amend,

*amicus* Oneida Ltd. vigorously presses the undue delay argument. Characterizing the delay here as "unduly excessive" given that a *quarter century* has elapsed since this case was first filed[,] Oneida Ltd. contends such delay is "highly relevant" to the issue of whether plaintiffs should be allowed to amend their complaints to add the private landowners. Oneida Ltd. Memo. at 21 (emphasis in original). In arguing that the Tribal plaintiffs excessively delayed in bringing their motions to amend, Oneida Ltd. urges this court to deny their motions on that basis alone. *Id.* (citation omitted). Next, Oneida Ltd. objects to any suggestion by the Tribal plaintiffs that the delay in seeking amendment is somehow excused as part of a deliberate litigation strategy on the part of those plaintiffs.

As to the U.S., Oneida Ltd. contends that it too acted with undue delay in bringing its motion to amend. Disparagingly noting, among other things, that "it took the federal government over a generation to get around to making up its mind whether to intervene in this case," Oneida Ltd. deems "spurious" the U.S.' argument that it did not act with undue delay because it filed its motion to amend only six months after it was allowed to intervene herein, and only three months after the lifting of the stay. *Id.* at 23. Oneida Ltd. then attacks the U.S. for failing to "warn[ ] the innocent landowners off the land, [and] instead ... actively benefit[ting] from the taxes it has levied on the rents, incomes, and profits generated from the use and development of the area." *Id.* at 23–24 (internal quotation marks and citation omitted). Reasoning that in its view the U.S. has delayed over 200 years in compensating "the Oneida for its large share of the original wrongdoing[,]" [10] and also pointing to the U.S.' "historic wrongdoing and its present refusal to waive sovereign immunity," [11] Oneida Ltd. chides the U.S.' proffered justification for seeking amendment, which is "to bring to final judgment all possible claims, against all possible parties[.]" *See* U.S. Memo. at 2.

Delay must be considered in context; not all delay will result in denial of a motion to amend. However, "the district court plainly has discretion to deny leave to amend where the motion is made after an inordinate delay, no satisfactory explanation is made for the delay, and the amendment would prejudice the defendant." *MacDraw, Inc. v. CIT Group Equipment Financing, Inc.,* 157 F.3d 956, 962 (2d Cir.1998) (citations and internal quotation marks omitted). Thus, "mere delay, absent a showing of bad faith or undue prejudice, does not provide a basis for denial of leave to amend[.]" *Messier v. Southbury Training School,* 3:94–CV–1706, 1999 WL 20907, at *3 (D.Conn. Jan.5, 1999) (citing *State Teachers Retirement Bd. v. Fluor Corp.,* 654 F.2d 843, 856 (2d Cir. 1981)). In fact, "[g]enerally[,] [even] unexcused delay ... will not bar [amendment] if no prejudice will ensue to the other parties." *H.L. Hayden Co. of New York, Inc. v. Siemens Medical Systems, Inc.,* 112 F.R.D. 417, 418 (S.D.N.Y.1986) (citation omitted). By the same token, though, "if a lengthy delay [does] exist[ ] before a motion to amend is made, it is incumbent upon the movant to offer a valid explanation for the delay." *Deere v. Goodyear Tire and Rubber Co.,* 175 F.R.D. 157, 166 (N.D.N.Y.1997) (citing, *inter alia, Evans v. Syracuse City School Dist.,* 704 F.2d 44, 47 (2d Cir.1983)). Not surprisingly, the "longer the period of an unexplained delay, the less will be required of the nonmoving party in terms of a showing of prejudice." *Block v. First Blood Assocs.,* 988 F.2d 344, 350 (2d Cir.1993).

Any case in which there has been a 25 year gap between the filing of the original complaint and a subsequent motion to amend must necessarily give the court pause. There is some superficial appeal to Oneida Ltd.'s arguments that it is simply too late in the day, especially for the Oneidas, to be amending their complaints to add some 20,-000 new defendants. In the end, however, delay does not factor heavily into the court's analysis of whether to allow amendment herein. To be sure, a considerable amount of time has elapsed since the commencement of

---

10. Oneida Ltd. Memo at 24.

11. *Id.*

this action and the filing of these motions to amend. The court cannot ignore the realities of this unparalleled litigation though. This case is still in its initial stages, with no discovery having been conducted and until now motion practice had been minimal and of no real import.[12] And, if the court's experience in other similar litigation is any indicator, a trial date easily could be years away. Thus, despite the fact that 26 years have passed since the commencement of this action, for all intents and purposes, it is still in the very early stages of what undoubtedly will be extremely protracted litigation.

What is more, the delay here is not attributable solely to the Tribal plaintiffs. It is a delay occasioned by all of the parties to his litigation. The Counties themselves acknowledged as much in 1990 when, in opposing consolidation, they explained that "although sixteen years old," the case "ha[d] not been litigated at all." Taylor Aff., exh. G thereto at 3. A decade ago the Counties further explained that the present case was "simply sitting awaiting the ultimate outcome in [the test case.]" *Id.* The Counties along with the other parties hereto willingly agreed, or at the very least sat silently by through the years, allowing this case to languish in wholly unproductive settlement efforts.[13] Thus, if blame is to be placed for the delay, it must be placed squarely at the feet of all litigants hereto who adopted a deliberate strategy of negotiating first and litigating second as a last resort.[14]

The nearly 25 year delay between the filing of the Oneidas' complaints and the filing of the present motions undoubtedly constitutes an inordinate delay. By the same token, however, "the amendment has not been delayed unduly, at least when measured within the life of the current federal suit[,]" which by any standards is far from the typical, run-of-the-mill federal action. *See Dodson v. The New York Times Company,* No. 97 Civ. 3838 LAP, 1998 WL 702277, at *5 (S.D.N.Y. Oct.7, 1998) (footnote omitted). At some point "delay [does] become[ ] fatal," but that point has not been reached in this litigation. *See Cooper v. Lubell,* 83 Civ. 2506, 1987 WL 14468, at *2 (S.D.N.Y. July 13, 1987) (internal quotation marks and citation omitted). Moreover, although Oneida Ltd. strongly implies that delay alone is a sufficient basis for denying a motion to amend, the court disagrees. *See Rotter v. Leahy,* 93 F.Supp.2d 487, 496 (S.D.N.Y.2000) (citation omitted) ("Typically, the moving party's delay, standing alone, is not sufficient reason to foreclose amendment."). This is not to say that there will never be a case where delay alone is a sufficient basis for precluding amendment. *See, e.g., Hickman v. U.S.,* 43 Fed.Cl. 424, 439 (1999) (and cases cited therein), *aff'd without published opinion,* 2000 WL 266486 (Fed.Cir. March 8, 2000). Nonetheless, in a case of this magnitude and atypical history, there is no basis for denying amendment based *solely* upon the Oneidas' delay in filing these motions.

Likewise, the court finds no undue delay on the part of the U.S. in seeking amendment. In fact, because the U.S. only became a party to this action in June 1998, and

---

12. Very early on in this litigation, in 1979, Madison County filed a summary judgment motion, which the court denied, on the narrow issue of whether an ICC decision constituted federal ratification of the treaties at issue herein. *See* Taylor Aff. at 3–4, ¶¶ 9 and 10, and exhs. H and I thereto. Upon certification to the Second Circuit, it dismissed the appeal "as improvidently granted." *See id.,* exh. J thereto at 2639 and 2648. For the next 19 years, with the exception of a motion to consolidate which was denied, no motions were filed in this case until the filing of the present motions in late 1998.

13. This reference to futile negotiation efforts excludes the recent efforts by settlement master Riccio.

14. Unfortunately this strategy failed miserably when recently this court was forced to declare an impasse in what had been the most constructive and hopeful prospect for settlement to date, conducted by Ronald J. Riccio, the settlement master chosen by the parties and approved by the court. The court would be remiss if it did not point out, yet again, the possibility that such divisive litigation could be avoided by a negotiated settlement. This litigation could also be avoided if Congress ultimately decides to resolve this land claim (and perhaps others) once and for all, by exercising its legislative prerogative and ratifying all of the challenged treaties. Ratification of the subject treaties is not a course of action which this court necessarily endorses, but from a practical standpoint it is a political reality of which plaintiffs, especially the Nation, should be fully aware.

because it moved for intervention six months later, it is in a vastly different position than the Tribal plaintiffs. The relative speed with which the U.S. moved to amend—six months after being granted intervenor status—makes it nearly impossible for the court to take seriously Oneida Ltd.'s undue delay argument as it pertains to the U.S.

Having found no *un*due delay in the filing of these motions to amend, the court will next consider whether the Counties would be unduly prejudiced by allowing amendment.

### 2. Undue Prejudice

■ In response to the claims of undue prejudice, which will be more fully discussed momentarily, the Oneidas, but not the U.S.,[15] argue that "perhaps [the] most significant[ ]" reason that the Counties' claim of undue prejudice is without merit is because they, along with the proposed defendants, have been on notice of this action at least since 1970 when the test case was filed. *See* Oneida Memo. at 17. In particular, the Oneidas posit that the landowners should have had common knowledge of this litigation through the numerous newspaper articles which have been published through the years, as well as title insurance policies and purchase contracts on homes. The private landowners also should have had notice of this lawsuit well before now, the Oneidas assert, because in a related action this court certified a defendant class of landowners in accordance with Rule 23, and required notification of same. *See Oneida Indian Nation of Wis. v. State of N.Y.*, 85 F.R.D. 701 (N.D.N.Y.1980) ("*Wisconsin*").

The court finds Oneidas' notice argument unpersuasive. In the first place, even *assuming* that the prospective defendants had prior notice of this litigation, the Oneidas have not explained how such notice would undermine the claims of prejudice which the Counties and Oneida Ltd. are raising. Moreover, the court has serious doubts as to

whether all of the 20,000 prospective defendants had prior notice of this lawsuit.

Certainly the Oneidas cannot rely upon the notification which this court ordered in *Wisconsin* because there no notice was required to landowners residing on and using two acres or less of land as their principal residence. *See id.* at 709–10. This court in *Wisconsin* limited the class to exclude the residential landowners so that the resulting class would be relatively more manageable—60,000, as opposed to 500,000 landowners. *See id.* at 706–08. Given that limitation, the private landowners in this case, many of whom the court assumes, as in *Wisconsin,* reside on less than two acres of property, reasonably could have assumed that they would *not* be named as defendants herein.

Nor is the court willing to impute knowledge to these private landowners based upon newspaper articles, title insurance and the like. Over the years, based upon such documents, as well as oral statements by the Oneidas themselves, the landowners also reasonably could have assumed that the Oneidas would *not* seek to eject their neighboring private landowners. For these same reasons, it would also have been reasonable for the private landowners to have assumed that the Oneidas would not seek to hold them financially responsible for alleged historical wrongs occurring over 200 years also. Thus, as will be seen, although the court finds that no *un*due prejudice will result from allowing plaintiffs to amend their complaints, lack of notice to the private landowners is not a basis for that finding.

■ "[P]rejudice alone is insufficient to justify a denial of leave to amend; rather the necessary showing *is* 'undue prejudice to the opposing party.'" *A.V. by Versace, Inc. v. Gianni Versace S.p.A.,* 87 F.Supp.2d 281, 299 (S.D.N.Y.2000) (quoting *Foman,* 371 U.S. at 182, 83 S.Ct. at 230) (emphasis added by *Versace* court) (other citations omitted). In determining what constitutes undue prejudice, courts "generally consider whether the

---

15. Curiously, the U.S. did not bother to address the prejudice issue in its moving papers, except to baldly state that the Counties would not be prejudiced. The U.S. gave no consideration to the potential prejudice to the landowners, espe-

cially in terms of the fact that like the Oneidas, for years they too have taken the position that the private landowners would not become political pawns in this litigation. Yet that is precisely what has happened by the filing of these motions.

assertion of the new claim or defense would (i) require the opponent to expend significant additional resources to conduct discovery and prepare for trial; (ii) significantly delay the resolution of the dispute; or (iii) prevent the plaintiff from bringing a timely action in another jurisdiction." *Monahan v. New York City Dept. of Corrections,* 214 F.3d 275, *pet. for cert. filed* (Sept. 6, 2000) (internal quotation marks and citation omitted). Of these three factors, only the first two are at issue here.

Insofar as the potential to delay resolution of the dispute is concerned, the addition of numerous parties will "significantly delay resolution of this lawsuit," argue the Counties, causing them "substantial[ ] prejudice[.]" *See* Co. Memo. at 5. Plaintiffs counter that amendment will not cause such a delay because to date there has been no discovery, no motion practice to speak of, and no other meaningful litigation efforts, save the present motions. This action still is in the "very early stages[,]" so there is "nothing to reopen or relitigate." *See* Oneida Memo. at 17; *see also* U.S. Memo at 6.

It is beyond dispute that the Oneidas significantly delayed in bringing these motions to amend. An *un*explained delay means that the non-moving party has to show less in terms of prejudice. *See Brass Construction v. Muller,* No. 98 Civ. 5452, 1998 WL 755164, at *2 (S.D.N.Y. Oct.28, 1998) (citing *Evans,* 704 F.2d at 46–47). This is so because "the risk of prejudice increases with the passage of time." *Schoenberg v. Shapolsky Publishers, Inc.,* 916 F.Supp. 333, 336 (S.D.N.Y.1996) (internal quotation marks and citation omitted). But here, the Oneidas did explain their delay, albeit not entirely to the court's satisfaction. Further, although this case is the oldest on the court's docket, pending over 26 years, the court cannot ignore the fact that in terms of active litigation, this case is no farther along than more recently filed cases. Thus, because the Oneidas did offer an explanation for delaying in seeking amendment, and because despite its 1974 filing date, this case still is in its infancy, the Counties, as the non-movants, must, make a greater showing in terms of prejudice.

In the end the prejudice inquiry involves a balancing process. The court must "weigh[ ] the potential for prejudice resulting from granting the amendment against the risk of prejudice to the moving party if the amendment is denied." *H.L. Hayden Co. v. Siemens Medical Systems, Inc.,* 112 F.R.D. 417, 419 (S.D.N.Y.1986) (internal quotation marks and citation omitted). As the non-movants, the Counties carry the burden in this balancing process "of demonstrating that substantial prejudice would result were the proposed amendment to be granted." *See* (citations omitted); *Anitec,* 1991 WL 44834, at *1 (same).

Attempting to satisfy that burden, the Counties identify a host of reasons as to why amendment will "significantly delay resolution" of this action: (1) possibility of "immediate[ ]" appeal of any class certification order which this court might grant, *see* Co. Memo. at 6; (2) necessity of new counsel becoming familiar with this action; (3) exacerbation and additional delay of already complex discovery; (4) "fact-specific defenses of private landowners[,]" *id.* at 8; and (5) an increase in motion practice, and in number of defenses, cross-claims, counterclaims and issues which result from the addition of new parties. The court is not satisfied however that any of these factors will significantly delay resolution of this action.

#### a. Potential Delay to Final Resolution

It is well settled that "one of the most important considerations in determining whether amendment would be prejudicial is the degree to which it would delay … final disposition of the action." *Krumme v. WestPoint Stevens Inc.,* 143 F.3d 71, 88 (2d Cir.), *cert. denied,* 525 U.S. 1041, 119 S.Ct. 592, 142 L.Ed.2d 534 (1998) (internal quotation marks and citation omitted). Thus, there is a relationship between delay and prejudice such that "prejudice tends to increase with delay[.]" *See Saxholm AS v. Dynal, Inc.,* 938 F.Supp. 120, 123 (E.D.N.Y. 1996) (and cases cited therein). Accordingly, "a proposed amendment … [is] especially prejudicial … [when] discovery ha[s] already been completed and [the non-movant] ha[s] already filed a motion for summary

judgment." *Krumme,* 143 F.3d at 88 (internal quotation marks and citation omitted). Therefore, although the court is separately examining delay and prejudice, it cannot ignore the nexus between these two *Foman* factors. Below, the court will briefly examine each of these aspects of potential delay.

The court finds completely without merit any claimed delay which might result *if* the court grants these motions; certifies a defendant class; grants the Counties permission to file an interlocutory appeal of the certification order pursuant to 28 U.S.C. § 1292; and *if* pursuant to that statute, the Second Circuit agrees to consider such an appeal. Plainly, this whole scenario is speculative. Not only are the Counties assuming that this court will permit amendment and certify a defendant class, but they are assuming that this court will grant them leave to file an interlocutory appeal—an issue which this district court has "first line discretion" to grant or deny. *See Swint v. Chambers County Comm'n,* 514 U.S. 35, 47, 115 S.Ct. 1203, 1210, 131 L.Ed.2d 60 (1995). The Counties are further assuming that the Court of Appeals would exercise its discretion and "permit an appeal to be taken from such order" of the district court. *See* 28 U.S.C. § 1292(b) (West 1993). Even if such an appeal was not so highly speculative, the immediate delay which supposedly would result from same would be a delay occasioned by the Counties themselves. Surely this is not the type of delay which would establish undue prejudice so as to warrant denial of a Rule 15 motion to amend.

Nor does the court find persuasive the Counties' delay argument based upon the fact that the addition of new parties will require new counsel to become familiar with the prior proceedings in this action. Given the current posture of this case, the court is at a complete loss as to how the Counties can claim that amendment will cause delay because "[m]any *sophisticated* issues of law and fact have been litigated ... over the years." *See* Co. Memo. at 7 (emphasis added). This comment is puzzling, to say the least, when there has been almost no active litigation in this case. Indeed, as land claim litigation

goes, despite its age, the filings in this particular case are relatively few, so in that respect any competent lawyer should be able to quickly become familiar with this case in a relatively short time.

Next, the Counties' assert that the addition of new parties will require "*highly* fact-intensive" discovery, thus further complicating and prolonging discovery which the Counties anticipate will be complex enough as it is. *See id.* at 7. Such discovery may well be necessary irrespective of whether or not additional parties are joined, however. Therefore, this argument carries little weight with the court. Furthermore, delay attributable to discovery is not a very convincing reason for denying amendment here because if the individual landowners are named as defendants herein, then, as in *Cayuga,* most likely a class would be certified, at least for purposes of establishing liability, if any. *See Cayuga Indian Nation v. Carey,* 89 F.R.D. 627, 633 (N.D.N.Y.1981) ("*Cayuga I*") (McCurn, S.J.) Thus, as in *Cayuga,* counsel for the class would coordinate all of the discovery efforts and motion practice on behalf of those landowners.

Equally weak is the Counties' argument that any delay attributable to "fact-specific defenses of private landowners" and equitable considerations "is sufficiently prejudicial to the[ir] ... right to a speedy resolution" of this matter as to mandate denial of plaintiffs' motion to join the landowners as defendants. *See* Co. Memo. at 8. As *Cayuga* has shown, it is possible to structure these land claim cases so that individual defendants are effectively removed therefrom, both in terms of liability and damages.[16]

■ Several other reasons which the Counties assert will cause prejudicial delay in resolving this litigation fall into the category of grasping at straws. The Counties claim that additional parties will result in more motion practice, more and perhaps different defenses, more cross-claims and counter-claims, and more litigation pertaining to damages. Even assuming this worst case scenario, the Counties fail to recognize that "mere 'time, effort and money' do[ ] not rise

---

**16.** *See* discussion *infra* at 93–94; and 95–97.

to the level of 'substantial prejudice.'" *See Brass Construction,* 1998 WL 755164, at *2 (quoting *Block,* 988 F.2d at 351). This is especially true in the present case where, by statute, defense costs are borne by the State.[17] *See* N.Y. State L. § 10 (McKinney 1995). In any event, because this litigation already is so complex, regardless of the number of parties involved, the expenditure of time, energy, and money here undoubtedly will be *very* substantial. Simply put, try as they might, the Counties are unable to convince this court that allowing amendment will result in a significant delay in resolving this action, so as to rise to the level of undue prejudice to them.

### b. Expenditure of Significant Additional Resources

The Counties fare no better with their argument that allowing plaintiffs to amend their complaint will force the Counties to expend "significant additional resources[.]" *See* Co. Memo. at 10. This particular factor is almost meaningless in this context where apparently money has been no object when it comes to either pursuing or defending these claims. Obviously, the court has not had occasion to review a billing statement from any of the counsel. It requires little imagination, though, even taking into account a matter as simple as number of lawyers present in court for any given proceeding, that money is being spent here without impunity. To the extent that granting the motions may require the Counties to expend additional resources such as time and effort, the court cannot find that such expenditures would rise to the level of undue prejudice. By its very nature, land claim litigation is extremely complex and, regardless of the number of parties involved, it requires considerable time, energy, money, not to mention sheer will, to successfully pursue or defend such an action. Thus, the court cannot find, as the Counties urge, that the expenditure of additional resources would be so prejudicial as to

mandate denial of plaintiffs' motions to amend.

In short, the court does not find that there is undue prejudice here in terms of either the potential for delay in resolving this action, or in terms of the expenditure of significant additional resources.

### 3. Bad Faith

In opposing these motions to amend, the Counties vigorously contend that all of the plaintiffs have acted in bad faith by employing Fed.R.Civ.P. 15(a) for purposes of impermissible "legal gamesmanship." *See* Co. Memo. at 12 (citation omitted). The Counties offer two reasons which they claim are indicative of plaintiffs' bad faith herein. The first is notice: because plaintiffs knew or should have known when they filed their respective complaints (the Tribal plaintiffs in 1974 and the U.S. in 1998) that they could have sought to repossess the subject property and name the individual private landowners as defendants, their failure to do so violates the spirit and intent of Rule 15. Secondly, the Counties maintain that plaintiffs have acted in bad faith because these motions to amend are nothing more than an oblique attempt to coerce the State into settlement. Hence, in the Counties' view, plaintiffs are invoking the liberal amendment provisions of Rule 15 for an impermissible motive—to force a settlement.

Oneida Ltd. is not making a bad faith argument *per se.* Many of the arguments which it makes in connection with undue delay are, however, tantamount to asserting bad faith in that they relate to plaintiffs' motives for seeking to amend at this juncture. Furthermore, as will become apparent, there are several striking similarities between Oneida Ltd.'s "undue delay" arguments and the Counties' bad faith arguments. Therefore, even though Oneida Ltd. is raising these arguments, such as notice and improper notice, in the context of undue

---

17. Section ten reads as follows:

The governor *shall, at the expense of the State,* employ counsel and provide for the defense of any action or proceeding, instituted against the State, or against any person deriving title

therefrom, to involve any lands within the State, undue pretence of any claim inconsistent with its sovereignty and jurisdiction.

N.Y. STATE L. § 10 (McKinney 1995) (emphasis added).

delay, the court finds the same to be highly relevant to the bad faith inquiry which it must make under *Foman;* and hence it will address the same now.

Like the Counties, Oneida Ltd. seriously questions plaintiffs' motives in seeking to join the private landowners so many years after the filing of the complaints in this action. The Oneidas' decision not to join the private landowners as defendants some 25 years ago is, as Oneida Ltd. describes it, "a purely strategic move[,]" which even standing alone is "fatal" to these motions to amend. *See* Oneida Ltd. Memo. at 22. More specifically, like the Counties, in essence Oneida Ltd. contends that the Tribal plaintiffs' delay in seeking leave to amend constitutes bad faith because those plaintiffs were on notice at the filing of the original complaint in 1974 that the individual landowners could have been named as defendants therein. *Id.* (quoting 6 CHARLES ALAN WRIGHT, ARTHUR R. MILLER, & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 1488, P. 688 (1990) (collecting cases)). Next, Oneida Ltd. directly attacks the Tribal plaintiffs' assertion that by waiting to file these motions to amend, they were doing nothing more than adopting a litigation strategy aimed at "minimal disruption." *See id.* at 22 (citation omitted). Then, again, as do the Counties, Oneida Ltd. asserts that the proposed addition of 20,000 private landowners is nothing but maneuvering on the part of the Oneidas "to gain a tactical advantage against the State so as '*to pressure [it] into reaching a settlement.*'" *Id.* at 23 (internal quotation marks and citation omitted) (emphasis in original).

The Oneidas strenuously dispute the charge of bad faith, explaining that once the Supreme Court held in 1985, *inter alia,* that they could maintain a federal common law based action for violation of their possessory rights, *see Oneida II*, 470 U.S. at 236, 105 S.Ct. at 1252, they chose negotiation in all of the related *Oneida* actions rather than further litigation. Failure of those negotiation efforts, argue the Oneidas, necessitated the filing of these motions. In light of the foregoing, the Oneidas disdainfully remark that the Counties' cries of bad faith are "simply wrong[,]" "[a]t best and [a]t worst, ... irre-sponsible rhetoric[.]" Oneida Reply Memo. at 3 (footnote omitted).

Distancing itself from the Tribal plaintiffs, the U.S. refutes the bad faith arguments by reiterating that it only became a party to this action fairly recently when it was granted intervenor status in June 1998; and it filed its amendment motion six months thereafter. Accordingly, the U.S. reasons that its motion to amend was not filed in bad faith and it is not, as the Counties suggest, engaging in "legal gamesmanship." U.S. Response at 6 (internal quotation marks omitted).

■ Few courts have denied leave to amend on the basis of bad faith. *See Dodson v. The New York Times Company*, No. 97 Civ. 3838 LAP, 1998 WL 702277, at *9 (S.D.N.Y. Oct.7, 1998); *but see Rotter*, 93 F.Supp.2d at 496 (recognizing that "[t]he possibility of bad faith is, in and of itself," justification for denying a motion to amend). As a result, there is little case law within this Circuit to guide this court in terms of what constitutes bad faith as a ground for denying leave to amend. It is well established, however, that "when the opponent of an amendment asserts that the movant is acting in bad faith, there must be something more than mere delay or inadvertence" to warrant denial of a Rule 15 motion. *See Primetime 24 Joint Venture and Primetime 24 Relay Corporation v. DirecTV, Inc.*, No. 99 CIV. 3307, 2000 WL 426396, at *5 (S.D.N.Y. April 20, 2000) (citing, *inter alia, Evans*, 704 F.2d at 47). By the same token, under certain circumstances "[d]elay as a predicate for a finding of bad faith is a sufficient reason to deny leave to amend[,]" especially when accompanied by undue delay or prejudice. *See Town of New Windsor v. Tesa Tuck, Inc.*, 919 F.Supp. 662, 676 (S.D.N.Y.1996) (citation omitted).

■ A finding that a party is seeking leave to amend solely to gain a tactical advantage, also supports a finding that such an amendment is made in bad faith. *State Trading v. Assuranceforeningen Skuld*, 921 F.2d 409, 417–18 (2d Cir.1990), is illustrative in this regard. The Second Circuit in *State Trading* affirmed the denial of a motion to amend where the plaintiff delayed raising certain claims to gain a strategic advantage

over the defendant. There, only well after the defendant challenged the applicability of Connecticut law did the plaintiff attempt to amend its complaint to include foreign law based causes of action. The Second Circuit agreed with defendant's observation that plaintiff "deliberately chose not to amend its complaint earlier to include [such] causes of action because any admission that foreign law applied ... would have increased the chance of dismissal on forum selection clause or *forum non conveniens* grounds." *Id.* at 418. Thus, relying upon the fact that plaintiff's "decision not to plead the additional causes of action was a tactical one," combined with the fact that with no justification plaintiff waited an "unreasonably long" time in seeking leave to amend, the Second Circuit affirmed the district court's denial of the motion to amend. *Id.; see also Chitimacha Tribe of Louisiana v. Harry L. Laws Company, Inc.,* 690 F.2d 1157, 1164 (5th Cir.1982) (citation omitted) (noting that "it is improper to amend solely to gain a tactical advantage[ ]").

The history of this litigation in terms of the private landowners, as set forth below, convinces the court that plaintiffs' "request for leave to amend reflects an evolutionary development that falls under the heading of bad faith." *See Lee v. Regal Cruises, Ltd.,* 916 F.Supp. 300, 304 (S.D.N.Y.1996), *aff'd without published opinion,* 116 F.3d 465 (2d Cir.1997).

### a. Oneidas

As to the Oneidas, the primary basis for the court's finding of bad faith is that since even before the filing of this lawsuit, they have steadfastly maintained that they were *not* seeking to disrupt the current landowners in any way. Now, despite 30 years of assurances to the contrary, the Oneidas are completely abandoning their conciliatory attitude toward the private landowners. Through these motions the Oneidas are seeking, *inter alia,* a remedy which would allow them to dispossess the private landowners of the property upon which they are currently residing. The Oneidas also are seeking to hold these landowners liable for monetary

damages. *See* Taylor Aff., exh. A thereto at 25, ¶ 68.

Presumably the Oneidas have always intended to eventually regain possession of the subject land through transactions between willing sellers and buyers. Until the filing of these motions to amend, however, they did not specifically claim entitlement to possession. For example, even prior to the commencement of the test case, in 1968, in a Complaint and Petition to the President of the United States ("the 1968 Petition"), in language which could not be more definite, the Nation declared:

> Be it clearly understood that the Oneida Nation has *no purpose or wish to eject* from such lands the *innocent people* who now have record title to them and reside thereon.∴... The Oneida Nation wishes *to secure from the State ... only fair and just compensation* for the lands unlawfully taken from them without due process of law.

*Id.* at 3 (quoting 1968 Complaint and Petition to the President of the United States) (emphasis added), *reprinted in* George C. Shattuck, *The Oneida Land Claims: A Legal History,* p. 90 (1991). In that same Petition, the Oneidas unequivocally declared that "[t]he people who now occupy the former Reservation *should be left peacefully there,* but the Oneida Nation should have justice too." 1968 Petition at 106 (emphasis added). The Oneidas now have abandoned these laudable goals by bringing the present motions— a course of action which this court cannot condone.

When the Oneidas commenced this action more than 25 years ago, they were aware of tensions which would likely result from litigation such as this. Indeed, so eager were the Oneidas to assuage public concern about litigation of this nature that they explicitly averred in their 1974 complaint that "[i]t has always been the policy of the Oneida Indians to live in peace and trust and friendship with their neighbors." Taylor Aff., exh. F thereto at 6, ¶ 19. The Oneidas' initial approach was wise and tempered and until these motions the court had no reason to believe that the Oneidas would seek to evict private property owners; or, for that matter, that they would

seek to hold current landowners individually liable for monetary damages.

In what can only be described as a drastic change of heart, now the Oneidas are expressly seeking *"possession* of the subject lands to which the proof demonstrates their entitlement[.]" *Id.*, exh. A thereto at 26, ¶ 69 (emphasis added). Elaborating, the Oneidas are seeking a declaration that they "are the owners of and have the legal and equitable title as well as *the right to possession* of the subject lands claimed or held by any defendant or member of the defendant class[.]" *Id.*, exh. A thereto at 28, Prayer for Relief at ¶ (3) (emphasis added). Similarly, the Oneidas seek a declaration "that the subject lands were acquired or transferred from [them] in violation of Federal law, and that the 30 Agreements and Letters Patent Transfers were void ab initio[.]" *Id.*, exh. A thereto at 28, Prayer for Relief at ¶ (2). In other words, the Oneidas are seeking a judicial declaration that the challenged treaties were null from the beginning. They also are seeking a declaration that "all interests of any defendant, *including all members of the Landholder Class*, in the subject lands are null and void[.]" *Id.*, exh. F thereto at 26, ¶ 69 (emphasis added).

Despite the possessory nature of their claims, nowhere in the Oneidas' amended complaint does the word "ejectment" or "eviction" appear. Evidently this complaint was carefully crafted to avoid such specific references. Clearly that is import of the allegations highlighted above, however. For example, practically speaking, the effect of a declaration that the Oneidas have the right to possess the subject land, is that they would have the concomitant right to, or at a minimum, the prerogative to, evict current landowners. Thus, if the court allows the Oneidas to amend their complaint to assert such possessory claims, whether they would *actually choose to exercise the option to* evict, the fact remains that eviction would be an option available to the Oneidas. Consequently, despite the Oneidas' repeated public assurances that they will not evict any current landowner, in considering these motions to amend the court cannot ignore the harsh reality of the possessory nature of the claims

which they are seeking to add to their complaint, especially as manifested in their requests for declaratory relief.

During oral argument there were some attempts by the Tribal plaintiffs, especially the Wisconsin, to *distance themselves from* the plain language of the amended complaint. *See* Tr. at 90 ("[T]here may be a means of implementing [a] judgment as against that class [current landowners] that would avoid involuntary eviction."). In fact, somewhat ironically given the relief which they are seeking on these motions, during oral argument the Wisconsin emphatically stated that they do not intend "to do to others what was done to them, and that is to involuntarily evict people currently in possession of th[e] [subject] land." *Id.* at 89–90. At the same time, however, the Oneidas had no choice but to concede the possessory nature of their claims. Indeed, the Wisconsin stressed that "the basic thrust of this action [ ]" is a "claim of *possession* for . . . land[.]" *Id.* at 48 (emphasis added). Then, responding to questioning by the court, the Nation admitted that even though "the potential of ejectment *is a disastrous thought*," it still should be "entitled to *proceed against . . . those persons who are wrongfully in possession* [including the current landowners.]" *Id.* at 54–55 (emphasis added).

Responding to further questioning by the court, the Nation was forced to concede that "the right of possession is inconsistent . . . with the possessory interests of those people who are on the land now." *Id.* at 56. The Wisconsin echoed this view, emphasizing that "[t]he *only claim* that any court has ever acknowledged in these land claim cases is the *current right of possession* that *must be asserted* against those *currently in possession*." *Id.* at 63 (emphasis added). In light of the foregoing, combined with the plain language in their amended complaint, apparently the Oneidas are intent on having the possibility of ejectment hanging over the landowners' heads like the proverbial sword of Damocles.

The Nation's recent actions in the mediation efforts during the 18 or so months of settlement negotiations before Mr. Riccio, and during the pendency of these motions, cause the court to be particularly skeptical of

the Oneidas' true motive for seeking to name the private landowners as defendants.[18] In April 2000, almost immediately after the Settlement Master announced that in his opinion the court should declare an impasse in the mediation efforts, the Nation reverted to what had always been, until quite recently, their position with respect to the individual landowners: it is *not* seeking monetary damages, nor ejectment from any private, individual landowner. For whatever reasons, possibly nothing more than posturing, even with these motions to amend still pending, the Nation indicated that it "wanted to extend an olive branch in [its] long-simmering land-claim dispute with New York State[.]" David W. Chen, *Indian Tribe Offers Landowners a Conditional Deal,* N.Y. TIMES, April 27, 2000, § B, at 6 ("Chen article").[19] This "olive branch" is in the form of a proposed stipulation ("stipulation")[20] wherein the Nation declares that it "will *not* seek damages or rent from or eviction of any private, non-governmental landholder" in this action. Declaration of William W. Taylor, III (Apr. 25, 2000), exh. B thereto (Stipulation) at 1, ¶ 1 (emphasis added).

The Nation's representative, Ray Halbritter, made much of this stipulation admitting that "[t]he landowners ... have endured ... uncertainty over their future," but that the Oneidas "hope" that the stipulation "will end that uncertainty." Chen article. At a press conference in April 2000, Halbritter stressed that the Oneidas "want to carry on with the statement ... that we *always* wanted to make sure the landowners who are innocent are protected[.]" Michelle Breidenbach, *No evictions, no rent, Halbritter promises,* SYRACUSE POST STANDARD, April 27, 2000 (emphasis added). Halbritter continued; in his view, even without the stipulation the land-

owners "were always protected because the Oneida Nation said they would be and our word is good." *Id.*

The Nation accuses the Counties of engaging in "irresponsible rhetoric," Reply Memorandum in Support of Plaintiffs' Motion for Leave to File an Amended Complaint at 3; but the Nation has it exactly backwards. It is the Nation which has been engaging in "irresponsible rhetoric," especially when it comes to the issue of the private landowners as potential defendants. If the Oneidas are sincere in wanting to "protect" these landowners, the solution is simple: withdraw these motions to amend. Understandably, nothing short of withdrawal (and most certainly *not* the Nation's proposed stipulation) will fully ease the landowners' fears of displacement and personal liability.

Close examination of the stipulation reveals its illusory nature. Without the necessary approval of all of the parties to this action, the stipulation is virtually meaningless. To date, only the Nations's counsel have executed it. In fact, except for the caption, the stipulation does not mention the other two Tribal plaintiffs. Whatever minimal impact this stipulation might have as is is further weakened by the fact that neither the State nor the Counties have executed it, although the stipulation purports to be an agreement between the Nation and those two governmental entities.

Another dubious aspect of this stipulation is its content. The stipulation's sweeping language decidedly favors the Nation, making it highly unlikely that the defendant Counties or the State would agree to execute it. For example, this "agreement" not to seek monetary relief or eviction from the private landowners, *"automatically* becomes

---

**18.** The court is fully cognizant of the fact that these actions were undertaken by the Nation. Given that neither the Wisconsin nor the Thames have expressly voiced any disagreement with this approach, however, the court deems this silence to mean that they acquiesce in the Nation's tactics. This implied acquiescence is not a stretch given that either the Wisconsin or the Thames, or both, just as easily could have withdrawn their motions to amend at any time, but they have not.

**19.** Pursuant to Fed.R.Evid. 201, the court takes judicial notice of the newspaper articles refer-

enced herein. *See Manufacturers Life Insurance Company v. Donaldson, Lufkin & Jenrette Securities Corporation,* No. 99 Civ.1944, 2000 WL 709006, at *1 n. 1 (S.D.N.Y. June 1, 2000) (taking judicial notice of newspaper article "describing a property-flipping scheme").

**20.** This stipulation was submitted as part of a motion, which the Nation filed on April 26, 2000, wherein it seeks to bifurcate this action, allowing plaintiffs to proceed first against the State only.

null and void and of no further effect[ ]" if *any* person, at *any* time, in *any* court contends that the stipulation *in any way* "affects or diminishes ... any reservation Plaintiff may have or the status of land Plaintiff possesses or may hereafter possess or any claim or right of Plaintiff against the State or the Counties[.]" Taylor Decl'n, exh. B thereto, at 2, ¶ 4 (emphasis added).

The Oneidas' motivation is all the more questionable given its unequivocal assertion that it "will *not* seek damages or rent from or eviction of any private, non-governmental landholder in" this action. If the Oneidas genuinely do not intend to seek any relief from the private landowners, then the court seriously questions the need and motivation for this stipulation. Given the heavily one-sided nature of this stipulation, as just described, and the highly doubtful assumption that the Counties and State would agree to the terms of same, the court concludes that, this stipulation is *not* an olive branch. It is simply another ploy by the Oneidas and the Nation in particular.

### i. Notice

A lack of prior notice to the current landowners bolsters the court's finding of bad faith on behalf of the Oneidas. Certainly there was nothing at the outset to preclude the Oneidas from naming the individual landowners as defendants, as has been done in other Indian land claim litigation. *See, e.g., Mashpee Tribe v. New Seabury Corp.,* 592 F.2d 575, 579 (1st Cir.1979) (tribe brought NIA action "against a defendant class representing landowners in the Town of Mashpee"); *Seneca Nation of Indians v. State of New York,* 26 F.Supp.2d 555, 559 (W.D.N.Y. 1998) (defendants in NIA action included "numerous" private party lessees), *aff'd. on other grounds,* 178 F.3d 95 (2d Cir.1999), *cert. denied,* 528 U.S. 1073, 120 S.Ct. 785, 145 L.Ed.2d 662 (2000); *Canadian St. Regis Band of Mohawk Indians v. State of New York,* 97 F.R.D. 453, 455 (N.D.N.Y.1983) (McCurn, S.J.) (St. Regis descendants brought suit under NIA against, among others, "a defendant class comprised on those with an interest in the subject land[ ]"); *Cayuga I,* 89 F.R.D. at 634 (certifying a defendant class of persons claiming an interest in the Cayuga claim area). Notably, there is nothing in the present record indicating that for some reason the Oneidas only recently became aware of the possibility that they could assert claims against the individual landowners.

As justification for not earlier naming the private landowners as defendants, the Oneidas point to the years of supposedly ongoing settlement efforts. Those efforts were on-again, off-again, however and marked, *inter alia,* by inner turmoil among the Tribal plaintiffs. In addition negotiation efforts, both past and more recently those conducted by then Settlement Master Riccio, appear to have been tainted by an appalling lack of sincerity and commitment. The court is cognizant of the fact that the doomed settlement negotiations before Riccio were not entirely the fault of the Oneidas. As the parties are fully aware, from the court's perspective, all participants in these negotiations have continually put their own self-interests ahead of the broader interest of the entire community, Oneida and non-Oneida alike who currently reside in the claim area.

The court does give some credence to the Oneidas' assertion that initially the negotiating first, litigating later strategy was a carefully orchestrated attempt to cause "minimal disruption[ ]" to the private landowners. *See* Oneida Memo. at 15. As the negotiations unfolded, however, particularly over the past 18 months or so, the fact that in the end, sadly, the court was forced to conclude that the Oneidas, among others, were not firmly committed to settlement, coupled with the timing of these motions, strongly belies the Oneidas' claim that they adopted a strategy of "minimal disruption," especially when it comes to the private landowners.

As an aside, the court cannot help but comment that in reality the Oneidas' strategy has resulted in maximum disruption, because through their repeated public assurances over the years that the private landowners would not lose their homes, nor be personally liable for monetary damages, the landowners were lulled into a false sense of security. Needless to say, this sense of security was shattered by the Oneidas filing of the present

motions. The federal government's joinder in these motions exacerbated the landowners' sense of betrayal. Not only have these motions been extraordinarily divisive, but, worst of all, they have incited threats and potentially dangerous consequences including physical assault on proponents and opponents of these land claims.

Under these circumstances, in the court's opinion the Oneidas' motives in bringing these motions were questionable and it is difficult to attribute anything other than bad faith to the Oneidas, where a grant of their motion would result in a threat of evicting thousands upon thousands of private landowners—a threat with which these landowners could be forced to live under for perhaps another decade as this lawsuit progresses. The court hastens to add, however, that it is not the threat of eviction, in and of itself, which it finds indicative of bad faith. Rather, as set forth above, that threat, in combination with the fact that for more than a quarter of a century the Oneidas have adamantly maintained that they do not intend to evict current landowners—a position which they have continued to espouse as recently as April 2000, well *after* the filing of these motions—convinces the court that these amendments are not sought in good faith.

### b. United States

■ Obviously the U.S. stands in a far different position than do the Tribal plaintiffs in terms of alleged bad faith. First, of all given the fact that the U.S. sought amendment within months of being granted intervenor status, the court cannot impute bad faith to the U.S. based upon a delay in making this motion. Nor, for that same reason, does the notice argument apply to the U.S. Additionally, in contrast to the Oneidas, the U.S. does not have a history of continually disavowing an intent to evict private landowners from the claim area. Nonetheless, the court finds that "is not unreasonable to impute lack of good faith" to the U.S. insofar as it is seeking to include the private landowners as defendants in this action. *See State Trading*, 921 F.2d at 418.

Based upon the trust relationship between the federal government and Indians, such as the Oneidas,[21] the U.S. intervened on behalf of the Oneidas. Like the Oneidas, in its initial complaint in intervention the U.S. did not name any individual landowners as defendants; only the Counties were so named. Then, as Local Rule 7.1(a)(4) mandates, when it filed its motion to amend the U.S. submitted a proposed amended complaint seeking to expand significantly the number of defendants, including the addition of approximately 20,000 individual landowner as defendants. In that complaint the U.S. also sought to expand the scope of the relief which it is seeking on behalf of the Oneidas. In addition to seeking declaratory relief, the U.S. sought monetary damages and *"possibly ... ejectment* [.]" U.S. Amended Complaint in Intervention (12/8/98) at 20, Wherefore Clause at ¶ (5) ("U.S. Amend. Co.") (emphasis added). Given that there is no indication to the contrary, the court reads this particular complaint of the U.S. as seeking all of the relief enumerated in the wherefore clause against *all* of the defendants including the individual landowners.

Believing that the federal government has turned its back on its own citizens, the private landowners are upset at the prospect, however remote, of losing their homes and at potentially being held for monetary damages. The potential class of landowners is not alone in this sentiment. Since the filing of these motions to amend, New York State Senator Charles Schumer and a New York congressional representative, Sherwood Boehlert, as well as Governor George Pataki, have taken up the landowners' cries, condemning the federal government for seeking to name the landowners as defendants in this action.

In response to this outcry of public opinion, at oral argument the U.S. advised the court that its amended complaint had been "misinterpreted." Tr. at 20. The court is hard-pressed to see how the public has "misinterpreted" this complaint, which is plain on its face. In any event, after pointed questioning by the court,[22] in a frantic attempt to

---

21. *See* FELIX S. COHEN'S HANDBOOK OF FEDERAL INDIAN LAW, Ch. 12, § B2d(1), 650–51. (1982 ed.).

22. Given the contradictions between the U.S.' first proposed amended complaint and its posi-

backpedal the U.S. explained that it *"never, ever* intended that tens of thousands of private landowners and business owners would be forcefully removed from their property." Tr. at 20 (emphasis added). *See also* O'Connell Letter at 1 (U.S. "not seeking ejectment against any private landholders in the claim area[ ]"). Upholding that representation, at the court's direction, shortly after oral argument the U.S. submitted a second proposed amended complaint wherein it specifically alleges that it *"is not* seeking ejectment of private landholders[,]" although it explicitly reserves the right to seek ejectment of the State and the Counties. *See,* U.S. Amend. Co. at 22, Wherefore Clause at ¶ 5; *see also* United States' Supplemental Memorandum of Law in Support of its Motion for Leave to File Amended Complaint ("U.S. Supp. Memo.") at 2 (emphasis added); O'Connell Letter at 1 (emphasis added) ("[T]he [U.S.] seeks to strike all reference to ejectment from the prayer for relief as applied to *individual* landholders.").

In this amended complaint, the U.S. alleges that the non-State defendants as well as the individual landowners "have unlawfully possessed the subject lands and acted to exclude the Oneida Indian Nation for its rightful possession of [same]." U.S. Amend. Co. at 20–21, ¶ 33. Similarly, the U.S. alleges that these proposed defendants "who claim title to and the right to possess the subject lands derived from the illegal transactions described [therein], have kept and continue to keep Plaintiff Tribes *out of possession* of the subject lands in violation of the Nonintercourse Act." *Id.* at 21–22, ¶ 37 (emphasis added). Furthermore, as are the Oneidas, the U.S. is seeking a declaration that because the State acquired the subject property in violation of federal law, the Treaties under attack are void *ab initio. See id.* at 22, Wherefore Claim at ¶ 2. The U.S. further seeks a declaration that the Oneidas have a continuing *right of possession* to the subject lands claimed or held by *any* defendants and/or *member* of the defendant class[.] *Id.* at 22, Wherefore Clause at ¶ 3 (emphasis added). Pursuant to Fed.R.Civ.P. 23, the U.S. still also seeks certification of a

defendant class of "approximately 20,000 or more persons" who "occupy or have or claim an interest in any of the subject lands and their successors and assigns[.]" *Id.* at 5, ¶¶ 9 and 10. Finally, in its amended complaint, the U.S. continues to seek monetary damages from the individual landowners. *See id.* at 22, Wherefore clause at ¶ (4).

As recently as June 14, 2000, the U.S. reaffirmed that it does not actually "seek," nor will [it] support [ ] ejectment of private landowners in the Oneida claim area. Letter from James F. Simon, Deputy Assistant Attorney General, U.S. Department of Justice, Environment and Natural Resources Division, to Court (June 14, 2000) ("Simon Let."). In that letter, the U.S. stresses that it "has made *absolutely clear* in open court and in [its] pleadings that it does *not* seek, and will *not* support, ejectment of private landowners in the Oneida claim area." *Id.* (emphasis added). It proposes making a motion seeking to hold the State "liable for any and all money damages to the Tribes for the *entire claim area* and the *entire period* since the State's violation of the [NIA][.]" *Id.* (emphasis added). In the meantime, the U.S. requests that the court "hold in abeyance any decision on whether to join a defendant landowner class[.]" *Id.* Lastly, if the court grants the U.S.' proposed motion, it would agree "to withdraw its motion concerning . . . the defendant landowner class *without* prejudice[.]" *Id.* (emphasis added).

The U.S. posits that this recently suggested course of action would "spare the public from unnecessary concern[,]" but the court is at a loss to see how. *Id.* Without critically analyzing each of the U.S.' four suggested proposals, the court does have a few observations. The first is that from a strategic standpoint, holding the present motion in abeyance, especially insofar as the private landowners are concerned, would only unnecessarily further prolong this litigation and increase community tensions in the claim area. Furthermore, it is troubling to the court that in this recent proposal, the U.S. is only willing to "withdraw *without prejudice*"

---

tion at oral argument, the court bluntly asked the U.S. if it is "seek[ing] possession of these lands and ejectment of the landowners or not?" Tr. at 20.

its motion to amend with respect to the private landowners. This leaves open the possibility that at a later date, the U.S. may still pursue relief against those landowners. Simon Let. at 2 (emphasis added). Given that possibility, it is difficult, if not impossible to see how, as the U.S. puts it, "the public will be spare[d] ... from unnecessary concern." *See id.* at 2. Given the exigencies which are inherent in land claim litigation such as this, not to mention the fact that in this case the Oneidas are challenging an unprecedented number of treaties, it is not unrealistic to expect that, including the inevitable appeals, this case will linger in the judicial system for years to come. Thus, while the U.S.' suggested course of action *may* temporarily assuage the private landowners' fears, it is just that—a *temporary* cure.

At the end of the day, the court cannot ignore the fact that despite the U.S.' oft-repeated assurances during oral argument and thereafter that it does not intend to evict current individual landowners, it, like the Oneidas, steadfastly declines to voluntarily withdraw its motion with prejudice as to these landowners. Initially, the U.S. claimed that its underlying motive for pursuing relief against the private landowners was its desire to "bring finality to this longstanding claim." Tr. at 19. Indeed, the U.S. continues to pursue this motion to amend, even though it fully recognizes, "that an unusual and unfortunate degree of anxiety among the landowners in the claim area has resulted from the pendency of [its] motion [to amend]." *See* Simon Ltr. at 1. The U.S.' willingness to continue pursuing amendment under these circumstances, coupled with the fact that it has retreated not once, but twice, in terms of its position as to the private landowners, causes the court to seriously question the U.S.' intent with respect to the private landowners' status herein.

This action has been fraught with enough tension and uncertainty without the U.S. vacillating on the critical issue of the private landowners' role, if any, in this litigation. The U.S.' failure to take a firm position on this issue early on and stand by it has, in the court's opinion, been extremely detrimental not only to the parties to this litigation, but to the entire Central New York community, especially those residing in or near the claim area. Simply put, the U.S. is trying to have its cake and eat it too; it is trying to appease both the Oneidas *and* the private landowners. The court adds that it is cognizant of the difficult position in which the U.S. finds itself here—at once purporting to represent the Oneidas' interests, interests which are, for the most part, directly antithetical to those of the private landowners. The fact that the U.S. is between a rock and a hard place does not, however, excuse its conduct in terms of its equivocal stance as to the private landowners.

## 4. Futility Doctrine

### a. Governing Legal Standards

" '[F]utility of amendment' [is] one factor which might overcome the privilege to amend." *Gursky v. Northwestern Mut. Life Ins. Co.*, 139 F.R.D. 279, 284 (E.D.N.Y.1991) (quoting *Foman*, 371 U.S. at 182, 83 S.Ct. at 230). Unfortunately for district courts applying *Foman*, futility is "neither explained nor expanded upon anywhere [there]in[.]" *Id.* The test of whether an amendment is futile has been variously stated by courts within this Circuit. *See, e.g., Mackensworth v. S.S. American Merchant*, 28 F.3d 246, 251 (2d Cir.1994) (internal quotation marks and citation omitted) ("That the amendment [ ] would not serve any purpose is a valid ground to deny a motion for leave to amend."); Saxholm *AS v. Dynal, Inc.*, 938 F.Supp. 120, 124 (E.D.N.Y.1996) (citation omitted) ("[A] proposed claim is futile only if it is clearly frivolous or legally insufficient on its face."). Irrespective of how the test is stated though, there is agreement that "[i]f the proposed claim sets forth facts and circumstances which may entitle the plaintiff to relief, then futility is not a proper basis on which to deny the amendment." *Saxholm*, 938 F.Supp. at 124 (citations omitted); *see also Rotter*, 93 F.Supp.2d at 497 (internal quotation marks and citation omitted) ("Dismissal is warranted only when the [pleader] cannot recover ... on the facts he has alleged.")

"A review of this Circuit's case law concerning ... 'futility' of amendment indicates that, in the main, a proposed amendment should be reviewed under a standard analogous to the standard of review applicable to a motion brought under Rule 12(b)(6)[.]" *Rotter*, 93 F.Supp.2d at 496 (citations omitted). "Accordingly, the Court treats the facts alleged by plaintiffs as true and views them in the light most favorable to them." *Id.* (citations omitted). "Thus, if the proposed amended complaint would be subject to 'immediate dismissal' for failure to state a claim *or on some other ground,* the Court will not permit amendment." *Versace* 87 F.Supp.2d at 298 (quoting *Jones v. New York State Div. of Military & Naval Affairs,* 166 F.3d 45, 55 (2d Cir.1999)) (emphasis added).[23] By the same token, however, on more than one occasion the Second Circuit has held that "[l]eave to amend may be denied where it appears that the proposed amendments are 'unlikely to be productive.' " *Versace,* 87 F.Supp.2d at 298 (quoting *Ruffolo v. Oppenheimer & Co.,* 987 F.2d 129, 131 (2d Cir.1993)) (other citation omitted).

### b. Summary of Arguments

Devoting a scant two paragraphs to the futility issue,[24] initially the plaintiffs posited that it would not be futile to allow amendment in light of two particular decisions in the test case—the Second Circuit's decision in *Oneida Indian Nation of New York v. Oneida County,* 719 F.2d 525 (2d Cir.1983) ("*Oneida Nation II*"), which the Supreme Court affirmed in relevant part in *Oneida II.* The Supreme Court's decision in *Oneida II* to expressly recognize the right of Indians, such as the Oneidas, to maintain federal common-law claims for wrongful possession of their lands was a watershed in terms of Indian law jurisprudence. In light of that decision, plaintiffs maintain that it is beyond cavil that their proposed claims against the private landowners, including ejectment, are not futile and hence the court should allow them to amend their complaints accordingly.

The Counties' argument that amendment would be futile is equally perfunctory. Relying upon their arguments in opposition to the Oneidas' separate motion for class certification, the Counties assert that allowing amendment to add countless private landowners would be futile because a class comprised of those individuals would not satisfy the requirements of Fed.R.Civ.P. 23. The Counties also maintain that such an amendment would be futile because certification of a class of private landowners would be unconstitutional.

Oneida Ltd. raises several other and in the court's view more significant arguments regarding futility. Oneida Ltd. first argues that there is no need to add the private landowners as defendants given that the State is in a position to pay any monetary damages to which the Oneidas ultimately may be entitled. Then, invoking "federal common law and equitable principles," Oneida Ltd. forcefully argues that any relief which the plaintiffs ultimately may be award-

---

23. The court recognizes that it need not always assess a proposed amended pleading in accordance with Rule 12(b)(6) standards. "In evaluating the futility of amendment, a number of courts have held that a summary judgment standard may be applied and leave to amend denied outright should the party seeking amendment fail to satisfy that standard." *Republic Nat. Bank v. Hales,* 75 F.Supp.2d 300, 308 (S.D.N.Y.1999) (and cases cited therein). "Other courts, ..., have at times allowed amendment, but simultaneously evaluated the amended pleading under the standards governing motions brought pursuant to Rule 56." *Id.* at 309 (and cases cited therein). However, because no discovery has yet been conducted in the present case, nor were the parties given "reasonable notice that they w[ould] be called upon to demonstrate the existence of disputed, material fact(s)[,]" the court

will not apply Rule 56 summary judgment standards to the present motions. *See id.*

24. Cursory treatment of all of the *Foman* factors is the hallmark of plaintiffs' supporting memoranda. This is particularly troubling given the serious ramifications of allowing amendment, especially in terms of the private landowners—ramifications of which surely these plaintiffs were aware. In fact the *pro forma* nature of plaintiffs' supporting memoranda, in part, motivated the court to grant Oneida Ltd.'s *amicus* status. As the court anticipated, the comprehensive and thoughtful analysis set forth in Oneida Ltd.'s memorandum, had the desired effect of forcing plaintiffs, in response to those arguments, to hone in on the futility issue in their supplemental memoranda (filed after oral argument).

ed in this case should not come at the expense (both literally and figuratively) of the private landowners who currently are residing in the claim area. To avoid any detrimental impact upon these landowners, Oneida Ltd. argues that the court should deny plaintiffs' motion to the extent they are seeking to add the same as defendants, a position which the Counties were quick to endorse during oral argument. *See* Tr. at 23–24 (characterizing as "an act of futility" the addition of private landowners because "no court in this land has to date ever evicted" the same, where they have been in possession for "the last 140 to 200 years[ ]"). In arguing that it would be futile to allow plaintiffs to amend their complaints, Oneida Ltd. raises a number of valid points which the court will address in turn.

### c. Test Case Decisions

After the Supreme Court's decision in *Oneida II* and the Second Circuit's decision in *Oneida Nation II* (two test case decisions), plaintiffs contend that the claims which they are seeking to add "cannot seriously be contested[.]" Oneida Pl. Memo. at 19; and U.S. Memo. at 7. In fact, the Oneidas go so far as to declare that in light of those two decisions, "[r]arely is a [c]ourt faced with claims as clearly established as those contained in the Amended Complaint." Oneida Pl. Memo. at 19. Curiously, despite the fact that plaintiffs purport to be discussing futility, originally this argument was confined to these two broad statements.[25]

Oneida Ltd. takes sharp exception to these bald assertions, distinguishing the *Oneida* test case from both a factual and legal standpoint. Factually, Oneida Ltd. stresses that in the test case the only two defendants were public, governmental entities—Oneida and Madison Counties—the same two Counties which at the moment are the only defendants in this action. Thus, as Oneida Ltd. reads *Oneida II* and *Oneida Nation II*, because

both are silent as to "potential *private* third-party liability[,]" neither is relevant to the issue of whether plaintiffs are entitled to amend their complaints to add the private landowners. *See* Oneida Ltd. Memo. at 8 (emphasis in original).

Oneida Ltd. further reasons that in arguing that the test case governs the outcome of these motions, the Oneidas are blurring the distinction between justiciability of claims and the relief sought. Concededly, after *Oneida II*, wherein the Supreme Court held, *inter alia*, that land claims such as those alleged herein are not barred by the political question doctrine, the justiciability of such claims is beyond dispute. *See* 470 U.S. at 248–50, 105 S.Ct. at 1259–60; *see also Oneida Nation I*, 691 F.2d at 1081 (citation omitted) ("to [the Second Circuit's] knowledge no Indian land claim has ever been dismissed on nonjusticiability grounds[ ]"). Given these readily apparent distinctions between the test case and the present case, Oneida Ltd. strongly disagrees with the Oneidas that the test case is determinative of whether it is permissible for plaintiffs to amend their complaints to name private landowners as defendants.

In response, the Tribal plaintiffs reprise a point which they stressed during oral argument: because they "hold a *federal common law right to current possession* of the subject lands," their claim is "for possession of the land, not . . . for historically adjusted damages." *See* Wis. Supp. Memo. at 7 (emphasis added); *see also* Memorandum of Oneida Indian Nation of New York and Oneida of the Thames in Response to Brief of *Amicus* Oneida Ltd. ("Nat. Resp.") at 2–4. In making this argument, plaintiffs point to the Supreme Court's acknowledgment in *Oneida I* that "the complaint [there]in . . . assert[ed] a *present right to possession* under federal law[,]" *see Oneida I*, 414 U.S. at 675, 94 S.Ct. at 781 (emphasis added); and the Court's later holding in *Oneida II* "that the Oneidas

---

**25.** At the court's request following oral argument the Wisconsin and the Thames jointly filed a supplemental memorandum, as did the Nation and the Thames (also jointly). In those memoranda, for the first time, the Oneidas meaningfully addressed the futility issue, rather than just paying lip service to that issue.

Following oral argument, the U.S. likewise filed a supplemental memorandum. In contrast to the Tribal plaintiffs' supplemental briefs, however, the U.S.' supplemental brief sheds no light on the futility issue.

can maintain this action for violation of their *possessory rights* based on federal common law." *See Oneida II*, 470 U.S. at 236, 105 S.Ct. at 1252 (emphasis added). According to the Oneidas this right, which they characterize as a continuing right of possession, exists regardless of the status of the occupant of the land—public entity or private owner. Thus, after the test case, the Oneidas are adamant that they can properly amend their complaints to assert claims against the private landowners for not only declaratory relief but also for ejectment and monetary damages.

There is no need, as the Tribal plaintiffs urge, for this court to decide here today whether to extend the test case rationale to private third-parties. The court need not travel down that untrodden path because there is a sharp distinction between the *existence* of a federal common law right to Indian homelands and how to *vindicate* that right— a distinction which in the court's opinion must be drawn, especially given that the alleged wrong in this case occurred more than 200 years ago. *See Navajo Tribe of Indians v. State of N.M.*, 809 F.2d 1455, 1467 (10th Cir.1987) (a claim or substantive right and a remedy are "two, distinct concepts"—a distinction which is "fundamental"). The Tribal plaintiffs mistakenly assume that to fully vindicate those rights, it is imperative that the private landowners be added as defendants herein. The court disagrees.

To the extent that the Oneidas in this particular case eventually may be able to establish that they have possessory rights in the claim area, such rights do not necessarily encompass the concomitant right to obtain relief directly from the current landowners. Similarly, the fact that the Oneidas' proposed claims against the private landowners may well be justiciable does not necessarily mean, *a fortiori,* that they are entitled to seek monetary damages from or to evict current landowners. In other words, this court does not equate justiciability of land claims with the availability of relief against private landowners especially where, as here, plaintiffs'

motivation for pursuing such claims is highly debatable. In sum, the court declines to read the various *Oneida* test case decisions as broadly as the Oneidas advocate. The inapplicability of the test case is only one reason, however, for the court's finding that it would be futile to allow plaintiffs to amend their complaint as to the private landowners.

### d. *Prior Land Claim Rulings*

 As all of the parties are fully aware, nearly 20 years ago, very early on in the so-called *"Big Oneida"*[26] case this court signaled its "keen[ ] aware[ness] of the serious, if not insurmountable, problems which would arise out of granting the plaintiffs the relief they seek[,]" including return of the subject property. *Oneida Indian Nation of New York v. New York*, 520 F.Supp. 1278, 1295 (N.D.N.Y.) (D.J., McCurn), *aff'd in part and remanded in part,* 691 F.2d 1070 (2d Cir. 1982) (*"Oneida Nation II "*). At that time, this court further recognized "that an award of possession ... would create utter chaos and disaster to many, socially, economically and politically." *Id.* A few years later in the *Cayuga* land claim litigation the defendants expressed similar concerns regarding the "dramatic potential consequences of an award of possession[.]" *Cayuga Indian Nation of New York v. Cuomo*, 565 F.Supp. 1297, 1308 (N.D.N.Y.1983) (*"Cayuga II "*). In the context of analyzing the justiciability of the Cayugas' claims, this court realized that ejectment "may be unavailable or impractical as too disruptive or unfair[.]" *Id.* (citation omitted). In fact, in *Cayuga II* this court carried one step further its prior observations regarding the potentially devastating consequences of ejectment, opining that as an alternative "historically adjusted monetary damages" could be awarded to the Cayugas. *Id.* (citation omitted). Based upon these prior statements, Oneida Ltd. explicitly invites this court to take the "next logical step," which it views as "holding that, pursuant to the standards of federal Indian law and federal equity practice ..., the plaintiffs do *not* have the right to eject, dispossess, *or* recover damages from the private landown-

---

**26.** This is yet another land claim action by these same Oneida plaintiffs, wherein they challenged the validity of two land transactions which oc-

curred during the Articles of Confederation period.

ers." *Id.* at 9 (emphasis added). For the reasons set forth below, the court accepts this invitation.

Two basic premises underlie Oneida Ltd.'s assertion that the Tribal plaintiffs should not be allowed to seek relief from the private landowners. First, Oneida Ltd. asserts that even in the absence of the private landowners as defendants, under the case law the Tribal plaintiffs "still [have] a claim for just damages from the guilty sovereigns(s)[.]" *Id.* at 9–10 (citation omitted). Second, relying principally upon *Yankton Sioux Tribe of Indians v. United States*, 272 U.S. 351, 47 S.Ct. 142, 71 L.Ed. 294 (1926), Oneida Ltd. invokes the "impossibility" doctrine, *i.e.,* the Tribal plaintiffs should not be allowed to seek ejectment against the private landowners because, given the drastically changed conditions of the claim area over the past 200 years, it would be "impossible" to eject those landowners. *See id.* at 357, 47 S.Ct. at 144. For these reasons, as well as for reasons of fairness and equity, Oneida Ltd. maintains that plaintiffs are barred from seeking ejectment or monetary damages from the private landowners; and hence it would be futile to allow plaintiffs to amend their complaints accordingly.

At this juncture, the court will confine its analysis to the issue of whether it would be futile for plaintiffs to amend their complaints to seek ejectment. Then it will go on to consider the related issue of whether it would be futile for plaintiffs to amend their complaints to seek monetary damages or declaratory relief, or both, from the private landowners.

### e. *Nature of Relief Sought*

### i. *Ejectment*

As the Oneidas are quick to point out, unlike the present case, for the most part *Yankton Sioux* and the other cases to which Oneida Ltd. cites "involv[ed] Federal takings, cases where the Nonintercourse act for other reasons did not apply and cases where *no possession was sought.*" *See* Nation Resp. at 13 (emphasis added). Therefore, the Oneidas deem that line of cases "irrelevant," Nation Resp. at 13; and "beside the point[,]"

Wis. Oneida Resp. at 2, in terms of whether ejectment is a viable remedy here.

The court readily admits that there are differences between the *Yankton Sioux* line of cases, which form the basis for Oneida Ltd.'s "impossibility" doctrine argument, and the present case. For example in *Yankton Sioux,* in its Petition for Certiorari, the Tribe unequivocally stated that it was "not claim[ing] the present value of [its] right in the ... Reservation, *nor* d[id][it] *resort* to the legal remedy of an *action in ejectment to recover* the exclusive *possession* of the property." *Indian Law,* 18 N.M.L.Rev. 403, 413–414 (1988) (footnote omitted) (emphasis added). Thus, in *Yankton Sioux,* the Tribe's unmistakable object was not to establish its rights to the quarry ... but to obtain compensation for the[ ] taking [of those rights]." *Id.* at 414.

In contrast, as previously discussed, the Oneidas most decidedly *are* seeking to establish their rights to the claim area. Moreover, the present case is based upon a series of alleged Nonintercourse Act violations—not upon a claimed taking under the Fifth Amendment, as was *Yankton Sioux.* Another case upon which Oneida Ltd. relies, *Felix v. Patrick,* 145 U.S. 317, 12 S.Ct. 862, 36 L.Ed. 719 (1892), likewise is distinguishable. In *Felix,* unlike here, the issue was whether the doctrine of laches should bar an action brought by the heirs of an Indian to establish a constructive trust over lands that had been conveyed 28 years earlier in violation of federal law.

Despite these differences, because there is a dearth of authority which is even remotely similar to, let alone directly on point with, the present case, the court finds *Yankton Sioux* and its progeny instructive. In that line of cases the courts articulated what has become known as the "impossibility" doctrine. Thus, stating the obvious, the Supreme Court in *Yankton Sioux* declared that it would be "impossible ... to rescind the cession and restore the Indians [sic] to their former rights, because the lands have been opened to settlement and large portions of them are now in the possession of innumerable innocent purchasers[.]" *See Yankton Sioux,* 272 U.S. at 357, 47 S.Ct. at 144.

In a similar vein, in *Felix* the Court held that laches barred that constructive trust action because during the intervening years, between the time of the conveyance and the commencement of the lawsuit, land "which was wild ... 30 years ago is now intersected by streets, subdivided into blocks and lots, and largely occupied by persons who have bought upon the strength of Patrick's title and have erected buildings of a permanent character...." *Felix*, 145 U.S. at 334, 12 S.Ct. at 868. The *Felix* Court also found significant the undeniably harsh result which would ensue if it were to order "surrender" of the disputed land to the plaintiffs; it "would result in the unsettlement of large numbers of titles upon which the owners have rested in assured security for nearly a generation." *See id.* at 335, 12 S.Ct. at 868.

These practical concerns as to the impossibility of restoring Indians to lands formerly occupied by them resonate deeply with this court. Such concerns are magnified exponentially here, where development of every type imaginable has been ongoing for more than two centuries—significantly longer than in either *Yankton Sioux* or *Felix*. Even facing such formidable obstacles to ejectment, plaintiffs still insist that it would be "premature and unfair" for the court to invoke the impossibility doctrine as a grounds for denying their motion to amend. *See* Wis. Resp. at 13; *see also* Nat. Resp. at 17. The court fundamentally disagrees; it would be unfair *not* "to limit [the] relief available for [plaintiffs'] claim[s] at this stage of the proceedings." *See id.* at 13.

Ordinarily, the court might be inclined to allow amendment and await further litigation before determining the scope of remedies available to a plaintiff. This case is far from ordinary however. If the court takes a "wait and see" approach, then because this litigation could span another decade, approximately 20,000 innocent landowners would needlessly be kept in a state of legal limbo. The court cannot countenance such a result. The court is acutely aware of the claims of serious and even tragic harms which the State of New York allegedly perpetrated upon the Oneidas. By the same token, however, it is unfathomable to this court that the remedy for such harms, if proven, should be the eviction of numerous private landowners more than 200 years after the challenged conveyances.

The court's decision to rely upon the impossibility doctrine at this juncture stems from its firm conviction, based in part upon experience which it has gained through the years presiding over other similar litigation, that the time has come to transcend the theoretical. The present motions cry out for a pragmatic approach. It is true that for a time in *Cayuga*, this court did entertain the possibility of ejectment as a remedy. Exercising an abundance of caution in this relatively nascent area of federal Indian law, (*i.e.* the appropriate remedies for land claims), the court in *Cayuga* did conduct an evidentiary hearing on the issue of the availability of ejectment as a remedy.

Like a Monday morning quarterback with the advantage of hindsight, however, the court is now convinced that that hearing can fairly be described as an academic exercise. Much of the proof adduced therein fell into the category of commonsense observations as to the relative pros and cons of ejectment. Many of the reasons which this court gave in *Cayuga Indian Nation of New York v. Cuomo*, 80–CV–930, 80–CV–960, 1999 WL 509442 (N.D.N.Y. July 1, 1999) (McCurn, Sr. J.) for not permitting ejectment, such as the potential for displacement of vast numbers of private landowners; "negative economic impact[;]" "widespread disruption" to everyone residing in the general vicinity of the claim area due, in part, to interference with transportation systems which currently transect the claim area, were self-evident. *See id.* at *22 and *29. The court gained little if any insight—either factually or legally—from that hearing; [27] it only needlessly prolonged the *Cayuga* litigation. And, ultimately the court held that ejectment was not an appropriate remedy in that case. *See id.* What is more, even though in *Cayuga* the private landowners were defendants practically from the outset, their presence was not crucial to

---

27. The court ventures to say that the same would be true even for a court whose docket has not

included almost 20 years of presiding over land claim litigation.

that litigation, and indeed only unnecessarily complicated it. In fact, as will be more fully discussed in the next section, eventually this court concluded that the only equitable and practical way to proceed in *Cayuga* was to conduct separate trials, with the State as the sole defendant in the first trial. *See Cayuga XI Indian Nation of New York v. Pataki,* 79 F.Supp.2d 66 (N.D.N.Y.1999).

The court will not wait for years to decide that ejectment is *not* a viable remedy here because, as *Cayuga* demonstrates all too well, holding resolution of that issue in abeyance only prolongs what the court perceives as the inevitable here: no private landowners will be evicted from property upon which they are currently residing. Furthermore, prolonging resolution of the ejectment issue only unduly heightens tensions and further divides the entire Central New York community. Indian land claim cases raise enough weighty issues without becoming mired down in issues, such as ejectment, which only serve to distract all concerned from the real task at hand—how, in the 21st century, to reconcile the Indians' interest in their homelands with those of current landowners who, understandably, also view the claim area as their "homeland."

Application of the impossibility doctrine to this litigation, which is based upon federal common law and the Nonintercourse Act, is not an entirely novel proposition. In *Oneida Nation I,* the Second Circuit explicitly recognized that the possibility ejectment might be deemed an " 'impossible' remedy," and thus an award of monetary relief would be a workable alternative remedy. *See Oneida Nation I,* 691 F.2d at 1083 (quoting *Yankton Sioux,* 272 U.S. at 359, 47 S.Ct. at 144). The Second Circuit further acknowledged that "[c]ourts have not been blind to the disruption caused by the mere filing of [land claim] lawsuits, . . . and may take into account the impossibility . . . of repossession in designing an appropriate remedy." *Id.* (internal quotation marks and citation omitted). Underlying this statement is the tacit assumption that while Indians are entitled to pursue their rights to certain lands which allegedly were taken from them in violation of federal law, given modern-day realities and the pas-

sage of more than 200 years, it may well be that ejectment is an impractical remedy in cases such as this.

The impossibility doctrine does factor into its reasoning in terms of whether it would be futile to allow plaintiffs to amend their complaints to seek ejectment of the private landowners. By no means, however, is that doctrine dispositive. The Oneidas' fairly recent actions provide an additional basis for this court's finding of futility here. As detailed in the earlier discussion of bad faith, during the pendency of these motions the Oneidas significantly retreated from the position which they are advancing on these motions—that they should be allowed to seek ejectment of the private landowners. Now, as previously discussed, they are taking the exact opposite position; they have no desire to eject the current, individual landowners. As also previously discussed, the U.S. too has withdrawn from its original position that it should be allowed to seek ejectment of the private landowners. If plaintiffs themselves are no longer seriously pursuing ejectment of private landowners, then there is absolutely no reason for the court to impose, by allowing amendment, the possibility of that drastic remedy with the concomitant state of disruption to the entire community effected thereby.

### ii. Monetary damages

The Oneidas are equally adamant that it would *not* be futile to amend their complaints to assert claims for monetary damages against the private landowners because they cannot obtain "complete monetary relief" without the proposed defendant class. *See* Tr. at 91. Further, they argue, "the availability of damages from [the] State in no way forecloses the availability of damages from others." Nation Resp. at 10. As with several other important issues which these motions raise, the U.S. did not address this one either.

Strongly disagreeing with the Oneidas as to the availability of monetary damages against the private landowners, Oneida Ltd. takes the opposition position. According to Oneida Ltd., the U.S.' presence in this case "now *guarantees* that the [Oneidas] can . . .

recover the full measure of appropriate damages from the State." *See* Oneida Ltd. Memo at 6 (emphasis in original). Therefore, it is not necessary to include third-party landowners as defendants.

As with ejectment, after careful consideration of all of the factors herein, the court determines not to allow plaintiffs to pursue claims for monetary damages against the private landowners. Again, the court's experience in *Cayuga* firmly convinces it that it would be futile to allow plaintiffs to seek monetary damages against these landowners. As the parties are well aware, approximately six months after oral argument on the present motions, in *Cayuga XI* this court held that the concept of joint and several liability was inapplicable. *See* 79 F.Supp.2d at 70. Joint and several liability "ha[d] no place" in that land claim litigation reasoned the court because for one thing it would be "manifestly inequitable[.]" *Id.* Elaborating, the court explained the "potential[ly] ... devastating result[s]" which would flow from applying joint and several liability in the context of that land claim:

> [A]ny one of the approximately 7,000 individual landowners could be held liable for the *entire* amount of damages sustained by the Cayugas for the past 200 years or so. By any calculation that would be an appreciable sum ..., especially when viewed in terms of individual responsibility for the same. Stated somewhat differently, the possibility exists, ... that if the State is held jointly and severally liable, any one of these defendants, including an individual landowner whose financial resources pale in comparison to the State's, would be financially responsible for an astronomical sum of money. Thus, although there is a strong argument to be made that the State properly could be held liable for all of the damages sustained by the Cayugas, it would be absurd to hold that a single present day landowner could likewise be held liable for all of these damages. Yet, that would be a necessary corollary of a finding of joint and several liability in this case.

*Id.* at 71–72 (footnote omitted).

Consistent with this finding, this court further held that it would conduct a separate trial against the State only. *Id.* at 76. Then, because the State and the U.S., as well as the Cayugas, assured the court that following a judgment against the State, they would not pursue any further claims against the non-State defendants, in all likelihood the end result in *Cayuga* is that the private landowners, after being dragged through 20 years of litigation, will not be held liable.

Although not raised by either the Counties or the *amicus,* there are several other reasons which factor into the court's decision that plaintiffs should not be allowed to amend their complaints to assert any claims against the private landowners. The plaintiffs vigorously dispute it, but in the court's opinion, the expansive nature of the relief which they are now seeking, particularly *vis-a-vis* the private landowners, "represent[s] a *radical* shift from the recovery sought in the[ir] original complaint[s]." *See Barrows v. Forest Laboratories, Inc.* 742 F.2d 54, 59 (2d Cir.1984) (emphasis added). As should be readily apparent by now, plaintiffs are seeking to greatly expand both the relief sought, as well as the number of potential defendants. Indeed, given nearly a quarter of a century of promises to the contrary, it is difficult to imagine a more "radical shift" in recovery sought than this recent attempt by the Tribal plaintiffs to seek ejectment and/or monetary damages, of the private landowners.

This "radical shift" in the recovery sought, particularly given the circumstances under which it was sought as outlined above, further justifies denying plaintiffs' motion to amend as against the private landowners. Keeping in mind the extremely unique circumstances which precipitated the filing of these motions, as well as what has transpired since, along with the relevant case law, convinces the court that there are absolutely no circumstances under which ejectment of the private landowners will be a viable remedy in this case. Likewise, for the reasons set forth herein, monetary damages also will not be recoverable against those landowners; nor will the court grant declaratory relief against them. Consequently, it would be futile to allow plaintiffs to amend their complaints

when it would be unproductive in that under the court's rulings today plaintiffs would not be entitled to recover the very relief which forms the basis for these motions.

To this point, the court, as did the parties, has focused exclusively upon amendment *vis-a-vis* the individual private landowners, with no mention of the three non-State entities. Because there is no discernible reason for distinguishing between the individual, private landowners and the non-State entities, at least for purposes of these motions to amend, the court finds that it would also be futile to allow plaintiffs to amend their claims to assert any claims for relief against these defendants.

To summarize, after carefully examining each of the *Foman* factors, and taking into account their combined effect, the court hereby:

(1) GRANTS plaintiffs' motion to amend to add the State of New York as a party defendant herein;

(2) GRANTS the plaintiffs' motion to amend to add the Oneida of the Thames as a party plaintiff herein;

(3) DENIES the plaintiffs' motion to amend to add the landowners and the non-state entities as defendants herein;

(4) DENIES the plaintiff Oneidas' motion to certify a defendant class of landowners, as moot; and

(5) directs plaintiffs within 45 days of the date hereof to file and serve revised amended complaints consistent with this court's rulings herein.[28]

IT IS SO ORDERED.

---

28. The proposed motions to intervene by various citizens groups are not before the court for consideration at this time and thus are not treated herein.